**Bob BULLOCK, Comptroller of Public Accounts of the State of Texas, Jim Mattox, Attorney General of the State of Texas and Ann Richards, Treasurer of the State of Texas, Appellants,**

v.

**TEXAS MONTHLY, INC., Appellee.**

No. 14692.

Court of Appeals of Texas, Austin.

May 27, 1987.

Rehearing Denied June 24, 1987.

Jim Mattox, Atty. Gen., David Mendez, Asst. Atty. Gen., Austin, for appellants.

R. James George, Jr., Eric G. Behrens, Graves, Dougherty, Hearon & Moody, Austin, for appellee.

Before SHANNON, C.J., and BRADY and CARROLL, JJ.

## ON MOTION FOR REHEARING

SHANNON, Chief Justice.

The opinion handed down by this Court on March 18, 1987, is withdrawn and this opinion is filed in its place.

Appellee, Texas Monthly, Inc., sued the Comptroller of Public Accounts and others in the district court of Travis County seeking recovery of sales taxes paid under protest. After trial to the court, the district court rendered judgment that Texas Monthly recover $149,107.74. This Court will reverse the judgment.

Texas Monthly publishes a general interest magazine on a monthly basis. Effective October 2, 1984, the sales of its magazine became subject to the sales tax. Tex. Tax Code Ann. § 151.051 (Supp.1987). Texas Monthly paid, under protest, $149,-107.74 which sum represented the tax on the sale of its magazine between January 21, 1985 and December 18, 1985.

Texas Monthly's suit for refund was predicated upon the fact that certain publications are exempted from payment of the sales tax. Tex. Tax Code Ann. § 151.312. That section provides:

Periodicals that are published or distributed by a religious faith and that consist wholly of writings promulgating the teaching of the faith and books that consist wholly of writings sacred to a religion or religious faith are exempted from the taxes imposed by this Chapter.

In its trial petition, Texas Monthly pleaded that:

Section 151.312 exempts from the sales tax religious periodicals. Such an exemption constitutes an unlawful discrimination based on the content of a publication and thus violates Plaintiff's rights guaranteed by the First and Fourteenth Amendments to the Constitution of the United States and Article 1, § 8 of the Constitution of Texas.

The district court's judgment declared § 151.312 unconstitutional "because it constitutes an unlawful discrimination based on the content of [Texas Monthly's] publication in violation of its rights under the First and Fourteenth Amendments of the U.S. Constitution and Article VIII § 1 of the Texas Constitution...."

Although the trial petition and the judgment are not entirely clear, the Comptroller and Texas Monthly in their briefs and oral argument took the position that the district court's judgment was grounded upon the premise that the § 151.312 exemption violated the equal protection and free speech clauses of the First and Fourteenth Amendments to the Constitution of the United States and the equal and uniform clause of Article 8 § 1 of the Constitution of Texas. In its brief, Texas Monthly discusses the establishment clause of the First Amendment but only as a part of its equal protection analysis.

Under point of error one, the Comptroller first asserts that the district court erred in concluding that § 151.312 violated the equal protection clause of the United States Constitution and the equal and uniform clause of the Texas Constitution. We agree.

 It is inherent in the exercise of the power to tax that a state be free to select the subjects of taxation and to grant exemptions. Equal protection does not impose on a state any rigid equality of taxation. Inequalities which result from sin-

gling out one particular class for taxation or exemption infringe no constitutional limitation. *Carmichael v. Southern Coal & Coke Co.,* 301 U.S. 495, 57 S.Ct. 868, 81 L.Ed. 1245 (1937). Like considerations govern exemptions from the operation of a tax imposed on the members of a class. The legislature is not bound to tax every member of a class or none at all. The legislature may make rational distinctions of degree having a rational basis. *Carmichael v. Southern Coal & Coke Co., supra; Hurt v. Cooper,* 130 Tex. 433, 110 S.W.2d 896 (1937); *American Transfer & Storage Co. v. Bullock,* 525 S.W.2d 918 (Tex.Civ. App.1975, writ ref'd). The exemptions, when subjected to judicial scrutiny, must be presumed to rest on a rational basis if any state of facts would support such basis. *Carmichael v. Southern Coal & Coke Co., supra.* Indeed, it is said that "the presumption of constitutionality can be overcome only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against persons and classes. The burden is on the one attacking the legislative arrangement to negate every conceivable basis which might support it." *Madden v. Kentucky,* 309 U.S. 83, 60 S.Ct. 406, 84 L.Ed. 590 (1940).

In its effort to meet this burden, Texas Monthly suggests that the § 151.312 exemption constitutes a law "respecting an establishment of religion," in violation of the United States Constitution,[1] and therefore is unsupported by any legitimate basis.

The United States Supreme Court has created a three-part test to aid in determining whether a statute violates the establishment clause:

First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, ... finally, the statute must not foster "an excessive entanglement with religion."

*Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 945 (1971).

"Each value judgment under the religion clauses must ... turn on whether particular acts in question are intended to establish or interfere with religious beliefs and practices or have the effect of doing so." *Walz v. Tax Commission,* 397 U.S. 664, 669, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970). Applying this criteria, this Court concludes that § 151.312 does not violate the establishment clause. Furthermore, we are of the view that the classification established by this tax exemption has a rational basis and, accordingly, does not deny appellee equal protection of the law.

■ The secular purpose served by a tax exemption for religious organizations was described in *Walz, supra.* In *Walz* the Supreme Court reasoned that such a tax exemption "restricts the fiscal relationship between church and state, and tends to complement and reinforce *the desired separation insulating each from the other.*" *Id.* at 676, 90 S.Ct. at 1415 (emphasis supplied).

■ Furthermore, the opinion in *Walz* demonstrates that the tax exemption at issue does not have the primary effect of advancing or inhibiting religion. To the contrary, the effect of religious tax exemptions such as § 151.312 is to permit religious organizations to be independent of government support or sanction. Although *Walz* recognized that "[g]ranting tax exemptions to churches necessarily operates to afford [them] an indirect economic benefit," the Court concluded that

[t]he grant of a tax exemption is not sponsorship since the government does not transfer part of its revenue to churches but simply abstains from demanding that the church support the state. No one has ever suggested that tax exemption has converted libraries, art galleries, or hospitals into arms of the state....

*Id.* at 674–75.

Nor does the fact that *Walz* involved an exemption granted to other "nonprofit, quasi-public corporations," as well as to

---

1. United States Const. amend. I states in part: "Congress shall make no law respecting an es- tablishment of religion...."

religious groups, distinguish it from this appeal. Although the broader based exemption in *Walz* provided a clearer case of non-sponsorship than is here present, the *neutrality* toward religion effected by the grant of an exemption for religious periodicals is just as evident. To discover an advancement of religion in this statutory scheme is to turn the intent and effect of § 151.312 on its head.

■ Finally, this Court concludes that § 151.312 does not excessively entangle the state in religious activities and, accordingly, the statute meets the third prong of the *Lemon v. Kurtzman* test. Once again, we refer to *Walz* as authority for our view. In *Walz* the Court noted that, generally, the grant of an exemption to religious organizations leads to lesser involvement by the State than does taxation. Nevertheless, "[i]n analyzing either alternative the questions are whether the involvement is excessive, and whether it is a continuing one calling for official and continuing surveillance leading to an impermissible degree of entanglement." *Id.* at 675. This analysis involves examination of "the character and purposes of the institutions that are benefitted, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority." *Lemon, supra* at 615, 91 S.Ct. at 2112.

To the extent § 151.312 creates entanglement, it creates entanglement between government and institutions with purely religious purposes. We are not faced, therefore, with the difficulties presented when the government attempts to limit its intrusion to the secular endeavors of a religious organization—for example, where government attempts to provide aid for the non-religious curriculum of sectarian schools and yet creates excessive entanglement by oversight measures intended to insure that the aid is not directed to religious purposes. *See Lemon, supra; Meek v. Pittenger,* 421 U.S. 349, 372, 95 S.Ct. 1753, 1766, 44 L.Ed.2d 417 (1975). Accordingly, our focus is on the nature of the State's aid and the relationship between the State and religious publishers that results from the aid.

The aid at issue is, of course, the indirect subsidy provided by the tax exemption to religious periodicals. No affirmative action by state government is necessary to bestow this benefit. Due to its passive nature, the tax exemption does not create the appearance of an ongoing partnership between the State and religion presented by direct aid. More important, the exemption is administered in such a manner that "official and continuing surveillance" by the government is avoided.

Wanda Hutcheson, supervisor for sales tax policy in the Comptroller's Office, testified that religious publishers may qualify for an exemption by making a one-time showing that they are a bona fide religious organization under Tex. Tax Code Ann. § 151.310. Hutcheson further testified that "we leave it to [the organization] to decide whether or not it's ... a publication that teaches their faith."

The Comptroller's application of § 151.312 in no manner resembles the "comprehensive, discriminating, and continuing state surveillance" which confronted the Supreme Court in *Lemon. Id.* at 619, 91 S.Ct. at 2114. In *Lemon,* the State had conditioned its direct aid to nonpublic schools with "pervasive" restrictions and a continuing right to inspect and audit school records. In contrast, our record demonstrates that the exemption is administered with a minimum of church-state entanglement and with an eye toward the goal of state neutrality codified in § 151.312 and elaborated in *Walz.*

Because the record in this appeal reveals "no realistic likelihood" that § 151.312 is enforced in such a way as to allow impermissible entanglement, this Court concludes that the Comptroller has met the third prong of the *Lemon* test. *See Hunt v. McNair,* 413 U.S. 734, 747–48, 93 S.Ct. 2868, 2876–77, 37 L.Ed.2d 923 (1973) (statute was constitutional where administrative scheme negated possibility that breadth of statute would lead to excessive entanglement).

■ The policy of neutrality toward religion embodied in § 151.312 provides a rational basis for the exemption and defeats any claim that the exemption violates the establishment clause. Accordingly, we conclude that § 151.312 does not deny appellee equal protection of the laws, nor does it violate the equal and uniform clause of the Texas Constitution.

■ Also under its first point of error, the Comptroller asserts that the district court erred in concluding that the § 151.-312 exemption violated the free speech clause of the First Amendment. We agree.

This issue is controlled by the holding of the United States Supreme Court in *Regan v. Taxation with Representation of Washington,* 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983). *Regan* involved the validity of Internal Revenue Code provisions which allowed contributions to tax exempt organizations to be tax deductible only if the organization did not engage in lobbying. Taxation With Representation claimed the denial of this tax benefit was an "unconstitutional condition" on its exercise of free speech through lobbying. The Supreme Court rejected this claim, stating that "[t]his Court has never held that Congress must *grant a benefit* such as [Taxation With Representation] claims here to a person who wishes to exercise a constitutional right." *Id.* at 545, 103 S.Ct. at 2001 (emphasis supplied). In short, the Supreme Court held that the failure of the State to *subsidize* speech does not significantly interfere with First Amendment rights.

The same logic applies to § 151.312 of the Tax Code. The legislature has chosen to grant a tax benefit to religious publications. However, Texas Monthly has not shown that the legislature's failure to grant this benefit to other types of publications has "coerced" them into restricting their right of free speech. *Cf. Speiser v. Randall,* 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). The first point of error is sustained.

On motion for rehearing, Texas Monthly contends that the opinion of the Supreme Court of the United States in *Arkansas Writers' Project, Inc. v. Ragland,* —— U.S. ——, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987) is dispositive of its claim that § 151.312 violates its right of free speech. Texas Monthly's position is predicated on a misinterpretation of *Ragland.*

In *Ragland,* the Supreme Court identified two impermissible types of discrimination against the press:

(1) a tax which treats the press differently from other enterprises;

(2) a tax which targets a small group within the press as a whole.

The Supreme Court determined that the tax exemption in *Ragland* was so broad that it had the effect of singling out a very small group of magazines for *taxation.* This appeal, to the contrary, presents the opposite situation. The great mass of publishers remain subject to the sales tax. The Legislature has rationally determined to *exempt* religious periodicals as a means of furthering the separation of church and state. Neither of the situations deemed objectionable by the Supreme Court in *Ragland* is presented in this appeal. As stated in the original opinion, this appeal falls within the Supreme Court's holding in *Regan v. Taxation With Representation of Washington, supra.*

■ Texas Monthly points out further that this Court failed in the original opinion to address the issue of whether the tax exemption at issue violates the free speech provisions of the Texas Constitution, Tex. Const.Ann. art. 1, § 8 (1984). This Court has discovered no Texas authority addressing this issue. Texas Monthly's motion for rehearing relies almost entirely on analysis of federal opinions to support its position that Article 1, § 8 has been violated. Moreover, Article 1, § 8, as it respects limitations on the *government's* right to restrict speech, is stated in terms practically identical to the free speech clause of the First Amendment.

Under these circumstances, this Court will rely on federal law for guidance, *See Jones v. Memorial Hospital System,* 677 S.W.2d 221 (Tex.App.1984, no writ). We conclude that the analysis set forth in *Regan v. Taxation With Representation, su-*

*pra,* applies with equal force to Texas Monthly's challenge under Article 1, § 8. Accordingly, we sustain the Comptroller's point of error number one, as it relates to the district court's conclusion that § 151.-312 violates Article 1, § 8 of the Texas Constitution.

██ In its prayer for relief, Texas Monthly, of course, asked that this Court affirm the district court's judgment. If, however, this Court concluded that the district court erred respecting § 151.312, Texas Monthly then requested that we remand the cause to district court for its consideration of issues raised but not there determined.

At oral submission, the Court inquired of counsel whether Texas Monthly had preserved its complaint concerning the issues not determined by the district court. By way of answer counsel requested, and obtained, leave to file a post-submission brief.

It is true that Texas Monthly pleaded that it was entitled to recovery of the taxes based upon one of several grounds. It is likewise true that the district court predicated its judgment upon only one such ground—the claimed unconstitutionality of § 151.312. Texas Monthly, however, did not complain in district court of the court's failure to consider and pass on its other asserted grounds of recovery, nor did it assert any such complaints by cross-points in this Court.

The trial court, of course, should be afforded an opportunity to correct any errors that it might have made in the judgment. Accordingly, to complain of the judgment on appeal, an appellee is required to bring those errors to the trial court's attention in some manner whether by filing exceptions to the judgment, notice of appeal, motion for new trial, or other. *West Texas Utilities Co. v. Irvin,* 161 Tex. 5, 336 S.W.2d 609 (1960); *Saenz Motors v. Big H. Auto Auction, Inc.,* 653 S.W.2d 521, 526 (Tex. App.1983), *aff'd* 665 S.W.2d 756 (Tex.1984); State Bar of Texas, Appellate Procedure in Texas § 15.16 at 351 (2nd ed. 1979). *See*

*Luna v. Southern Pacific Transportation Co.,* 724 S.W.2d 383 (Tex.1987).

Contrary to appellee's argument in its motion for rehearing, the fact that this Court granted appellee leave to file a post-submission brief does not somehow supply the missing trial court predicate for the assertion of cross-points in this Court nor does it cure appellee's failure to complain by cross-points in this Court of the trial court's failure to rule on its additional grounds of recovery.

Accordingly, Texas Monthly waived any right it may have had to require the district court to consider and pass on its other grounds of recovery. State Bar of Texas, Appellate Procedure in Texas § 15.16 at 351 (2nd ed. 1979).

The judgment of the district court is reversed and judgment is here rendered that Texas Monthly take nothing.

CARROLL, Justice, dissenting.

I respectfully dissent. I am particularly troubled by the impermissible intrusion of the State into religious affairs mandated by the *express terms* of § 151.312. Before allowing an exemption under § 151.312, the Comptroller must not only determine whether a bona fide "religious faith" is distributing the periodical, he must also assess whether the publication consists "wholly" of writings promulgating the teachings of the "religious faith."

The First Amendment of the United States Constitution provides:

Congress shall make *no law respecting an establishment of religion,* or prohibiting the free exercise thereof ...

This language does not contemplate that the government may nonetheless pass laws respecting an establishment of religion *so long as* government officials fairly administer the law. It is important for the continued ability of all people to worship as they choose that no state official be allowed to determine what is and what is not a religion.

I find § 151.312 unconstitutional under the establishment clause of the First Amendment for two basic reasons.[1] First,

1. Although not mentioned or preserved for our review are the Texas constitutional provisions

and foremost, the exemption engenders impermissible state entanglement with religion. Second, as written, § 151.312 has a constitutionally prohibited primary effect of advancing religion.

## ENTANGLEMENT

The majority correctly indicates that in determining whether the entanglement engendered by state legislation is constitutionally impermissible, *i.e.*, continuing and excessive, one must look at the character and purpose of the benefited institutions, the nature of the aid, and the resulting relationship between the state and the religious entity. Here, the benefited institutions are *only* religious organizations.

Furthermore, the state aid given is tax favoritism, which has been described as a subsidy. *See Regan v. Taxation With Representation*, 461 U.S. 540, 544, 103 S.Ct. 1997, 2000, 76 L.Ed.2d 129 (1983). The resulting relationship is by no means passive since the statute requires the Comptroller to continually examine religious periodicals and the "religious faiths" promulgating them to determine whether they meet the statutory prerequisites of consisting "wholly" of the teachings of the "religious faith." By *requiring* the Comptroller to inquire into the dogma and belief of a religious faith, § 151.312 results in *extensive* and *impermissible* state involvement with religion.

which would support Texas Monthly's position. The pertinent provisions would be:

Article I, § 6 Freedom of Worship

All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences. No man shall be compelled to attend, erect or support any place of worship or to maintain any ministry against his consent. No human authority ought, in any case whatever, to control or interfere with the rights of conscience in matters of religion, and no preference shall ever be given by law to any religious society or mode of worship. But it shall be the duty of the Legislature to pass such laws as may be necessary to protect equally every religious denomination in the peaceable enjoyment of its mode of public worship.

Article I, § 7 Appropriations for Sectarian Purposes

No money shall be appropriated, or drawn from the Treasury for the benefit of any sect, or religious society, theological or religious seminary; nor shall property belonging to the state be appropriated for any such purposes.

These sections, when combined, preclude the state from establishing a religion, from aiding a particular religion, from aiding all religions, or from preferring one religion over another. A definite *wall* of separation between church and state is created. In addition, in comparison with the First Amendment of the United States Constitution, Article I, § 6 is more expansive in terms of guaranteeing protection equally of all religions, as well as the right to worship or not to worship, and Article I, § 7 contains a more specific prohibition on establishment.

A basic difference surrounds the Texas Constitution in contrast to the Federal Constitution which favors future reliance on the former. The Texas Bill of Rights is written as an affirmative grant of protections, whereas the federal constitutional language is negatively drafted as a restriction on the powers of government. Where the language of the Texas Constitution

differs it is important to reevaluate the issue "to ascertain and give effect to the plain intent and language of the framers and of the people who adopted it." *Gregg v. Cayuga Independent School District*, 539 S.W.2d 861, 865–66 (Tex.), *appeal dismissed*, 429 U.S. 973, 97 S.Ct. 478, 50 L.Ed.2d 581 (1976).

There is a presumption that the language used was carefully selected, made to express the will of the people, and that in adopting it the drafters intended to give effect to every one of its provisions. *Mellinger v. City of Houston*, 68 Tex. 37, 3 S.W. 249, 252 (1887). Therefore, structural, historical, and comparative analyses are all important. Harrington, The Texas Bill of Rights and Civil Liberties, 18 Tex.Tech.L.Rev. 1487, 1505 (1986).

The Texas constitutional provisions concerning religion, although in part declaratory of the earlier experiences of America, also reflect an immediate experience in religious intolerance suffered by Texas settlers before their independence from Mexico. At the time of the separation, the laws of Mexico made Catholicism the established religion. The Catholic church was therefore supported by governmental taxation of the citizenry as a whole. The Texas Declaration of Independence in 1836, charged that the Republic of Mexico had denied the colonists the right to worship according to the dictates of their consciences through required support of a national religion. The basic tenet of freedom of religion, which among others prompted the Texas colonists to declare their independence, was carried forward in the language of the first Constitution of the Republic and later state constitutions in order to guard against any future encroachments. *See Church v. Bullock*, 104 Tex. 1, 109 S.W. 115, 117 (1908).

The rich Texas historical background consequently suggests specific constitutional protections not afforded by the United States Constitution. The language and early Texas experience clearly denote a stronger belief in the separation of church and state.

It is irrelevant what a given employee of the Comptroller's Office testifies to how an exemption will be administered. Over the course of time many such individuals will administer and interpret the exemption. We cannot under the First Amendment allow shadowy government officials to determine what is a religious faith and what writings are true to the faith's doctrine. *See Presbyterian Church v. Hull Church,* 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969). Hence, unlike in *Hunt v. McNair,* 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973), the institutions regulated here are more than just permeated with a substantial religious character—they are religious organizations.

The language in the Bill of Rights was not drafted on the assumption that government will exercise power properly, but against the possible reality that the power to rule may be abused. The First Amendment does not simply prohibit the establishment of a state church or a state religion, instead it commands that there should be "no law *respecting* an establishment of religion." A given law might not *establish* a state religion but it may nevertheless be one "respecting" that end in the sense of being a step that could lead to such establishment and hence offend the First Amendment. *Lemon v. Kurtzman,* 403 U.S. 602, 612, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). The "perception" that government is aiding religion is enough to strike a law as violating the establishment clause. *Cf. Grand Rapids School Dist. v. Ball,* 473 U.S. 373, 105 S.Ct. 3216, 3226, 87 L.Ed.2d 267 (1985). No ongoing partnership needs to be shown.

## PRIMARY EFFECT

Inherent in the First Amendment is an antagonism between the command not to establish a religion and the command not to inhibit its practice. Either religion clause if expanded to its logical extreme would tend to clash with the other. As a result of this tension, state actions must maintain an attitude of "neutrality," neither *advancing* nor *inhibiting* religion. *See* Committee for *Public Education v. NyQuist,* 413 U.S. 756, 788, 93 S.Ct. 2955, 2973, 37 L.Ed.2d

948 (1973). So long as a law avoids "classifications" couched in terms of religion, either to confer a benefit or to impose a burden, the legislation will be in conformity with both religion clauses. I regard *Walz v. Tax Commission,* 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) as standing for the proposition that in order to fulfill the intention of avoiding inhibiting the free exercise of religion by exempting religious organizations from taxes, the statute must be drafted broadly enough so as to not offend the prohibition against establishing a religion.

In *Walz,* the Supreme Court upheld the granting of property tax exemptions to churches *as part of a general exception for a wide variety of nonprofit institutions.* The challenged New York statute exempted not only all religious organizations, but also hospitals, libraries, playgrounds, scientific, professional, historical, and patriotic groups. The breadth of the exemption indicated it had a secular purpose and provided only "incidental" aid to religion. *Walz v. Tax Commission, supra* at 673, 90 S.Ct. at 1413. As a consequence, *Walz* does not approve granting exemptions for church property where no similar exemptions exists for other social services or nonprofit activities. Such a preferential exemption would almost certainly constitute a prohibited aid to certain religious entities.

Subsequent U.S. Supreme Court decisions support this view. In *Gillette v. United States,* 401 U.S. 437, 454, 91 S.Ct. 828, 838, 28 L.Ed.2d 168 (1971), the court indicated while citing *Walz* that "under the establishment of religion clause of the First Amendment, government 'neutrality' in matters of religion is not inconsistent with 'benevolence' by way of exemptions from onerous duties, *so long as an exemption is tailored broadly enough that it reflects valid secular purposes.*" (emphasis added). Likewise, in *Committee for Public Education v. NyQuist, supra* at 794, 93 S.Ct. at 2976, the court recalled that the exemption challenged in *Walz* was not restricted to a class composed exclusively or even predominantly of religious institu-

tions. Hence, "the narrowness of the bene-fitted class would be an important factor" in any future challenges of statutory provisions under the established clause. *See also Forest Hills Early Learning Center, Inc. v. Lukhard,* 728 F.2d 230, 242 (4th Cir.1984); Nowak, Rotunda & Young, Constitutional Law, ch. 19, § II at 1033 n. 14 (2nd ed. 1983).

By interpreting *Walz* as approving only church property tax exemptions incidental to a broader tax exception, *Walz* may thereby be reconciled with other establishment clause cases. For instance, in *Board of Education v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968) and *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947) the class of beneficiaries included *all* school children, those in public as well as those in private schools. In *Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 290 (1971), federal aid was made available to *all* institutions of higher learning. To achieve the requisite neutrality required to avoid neither "advancing" nor "inhibiting" religion, the Supreme Court has in each of the above examples upheld classifications not couched in terms of religion.

The bottom line is that any tax exemption which is drafted narrowly in terms of religion—more narrow than the New York exemption upheld in *Walz*—offends the establishment clause. Special tax benefits given only to religions cannot be squared with the principle of neutrality, and such laws have the *inevitable effect* and purpose of aiding and advancing only those benefited religious institutions. *See Committee for Public Education v. NyQuist, supra* at 793, 93 S.Ct. at 2975.

In summary, I find that § 151.312 is an unconstitutional infringement of the establishment clause of the First Amendment of the United States Constitution, applicable to the States under the Fourteenth Amendment. Since the protections under the establishment clause have been held to be fundamental, *see Everson v. Board of Education, supra,* laws which classify in contravention of those protections must meet strict tests of constitutionality without need to resort to the equal protection clause. Consequently, having found no compelling reasons underpinning § 151.-312, I conclude the provision is unconstitutional without resorting to an equal protection analysis.

### REMEDY

The Comptroller's Office takes the position that should § 151.312 be declared unconstitutional, the appropriate remedy is to sever § 151.312 from the main taxing provisions. The consequences of this proposed action would be to impose a tax on all religious periodicals.

Support for the Comptroller's argument can be found in Tex. Tax Code Ann. § 101.002 (1982 & Supp.1986) which incorporates by reference the Code Construction Act. Section 311.032(c) of the Code Construction Act provides:

> In a statute that does not contain a provision for severability or nonseverability, if any provision of the statute or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the statute *that can be given effect without the invalid provision* or application, and to this end the provisions of the statute are severable. (emphasis added).

Tex.Gov't Code Ann. § 311.032(c) (1985). Hence, based upon § 311.032(c), this Court could sever only § 151.312 without violating the doctrine of separation of powers by imposing a tax.

Despite the technical feasibility of the Comptroller's argument, I find that the remaining taxing scheme absent § 151.312 cannot be given effect consistent with the religion clauses of the First Amendment. The equal taxation treatment suggested by the Comptroller creates a dilemma in applying the *Lemon v. Kurtzman, supra,* three-prong test. Although religious periodicals would be taxed on the same basis as other periodicals, the elimination of the exemption would under the reasoning in *Walz* result in greater entanglement in church affairs. Hence, the purpose and primary effect of the legislation absent § 151.312 would be secular, but the entanglement

created in the evaluation of church property, tax foreclosures, and those confrontations which follow the taxing process would contravene the principles in *Walz.*

Had § 151.312 been drafted more broadly, my decision might be different; however, to be consistent with *Walz* and the antagonism inherent in the religion clauses, I find the taxing provision must be struck as applied to all periodicals. I would therefore overrule both points of error brought by the Comptroller and affirm the district court's judgment.