# TEXAS MONTHLY, INC. *v.* BULLOCK, COMPTROLLER OF PUBLIC ACCOUNTS OF STATE OF TEXAS, ET AL.

No. 87–1245.  Argued November 1, 1988—Decided February 21, 1989

2

4

Brennan, J., announced the judgment of the Court and delivered an opinion, in which Marshall and Stevens, JJ., joined. White, J., filed an opinion concurring in the judgment, *post*, p. 25. Blackmun, J., filed an opinion concurring in the judgment, in which O'Connor, J., joined, *post*, p. 26. Scalia, J., filed a dissenting opinion, in which Rehnquist, C. J., and Kennedy, J., joined, *post*, p. 29.

*Roger James George, Jr.,* argued the cause for appellant. With him on the briefs were *John M. Harmon* and *Pamela Stanton Baron.*

*Harriet D. Burke,* Assistant Attorney General of Texas, argued the cause for appellees. With her on the brief were

*Jim Mattox,* Attorney General, *Mary F. Keller,* First Assistant Attorney General, and *Lou McCreary,* Executive Assistant Attorney General.*

JUSTICE BRENNAN announced the judgment of the Court and delivered an opinion, in which JUSTICE MARSHALL and JUSTICE STEVENS join.

Texas exempts from its sales tax "[p]eriodicals that are published or distributed by a religious faith and that consist wholly of writings promulgating the teaching of the faith and books that consist wholly of writings sacred to a religious faith." Tex. Tax Code Ann. § 151.312 (1982). The question presented is whether this exemption violates the Establishment Clause or the Free Press Clause of the First Amendment when the State denies a like exemption for other publications. We hold that, when confined exclusively to publications advancing the tenets of a religious faith, the exemption runs afoul of the Establishment Clause; accordingly, we need not reach the question whether it contravenes the Free Press Clause as well.

I

Prior to October 2, 1984, Texas exempted from its sales and use tax magazine subscriptions running half a year or longer and entered as second class mail. Tex. Tax Code Ann. § 151.320 (1982). This exemption was repealed as of October 2, 1984, before being reinstated effective October 1, 1987. Tex. Tax Code Ann. § 151.320 (Supp. 1988–1989). Throughout this 3-year period, Texas continued to exempt from its sales and use tax periodicals published or distributed by a religious faith consisting entirely of writings promulgating the teaching of the faith, along with books consisting

---

*Briefs of *amici curiae* urging reversal were filed for the American Booksellers Association, Inc., by *Maxwell J. Lillienstein;* for the American Civil Liberties Union et al. by *James C. Harrington, Steven R. Shapiro,* and *John A. Powell;* and for the Magazine Publishers of America, Inc., by *Eli D. Minton* and *James R. Cregan.*

solely of writings sacred to a religious faith. Tex. Tax Code Ann. § 151.312 (1982).

Appellant Texas Monthly, Inc., publishes a general interest magazine of the same name. Appellant is not a religious faith, and its magazine does not contain only articles promulgating the teaching of a religious faith. Thus, it was required during this 3-year period to collect and remit to the State the applicable sales tax on the price of qualifying subscription sales. Tex. Tax Code Ann. §§ 151.051, 151.052, 151.401 (1982 and Supp. 1988–1989). In 1985, appellant paid sales taxes of $149,107.74 under protest and sued to recover those payments in state court.

The District Court of Travis County, Texas, ruled that an exclusive exemption for religious periodicals had "no basis . . . other than the promotion of religion itself, a prohibited reason" under the Establishment Clause. App. to Juris. Statement 47. The court also found the exemption unconstitutional because it discriminated on the basis of the content of publications, presumably in violation of the Free Press Clause. Id., at 42. Declaring itself "without power to rewrite the statute to make religious periodicals subject to tax," id., at 47, the court struck down the tax as applied to nonreligious periodicals and ordered the State to refund the amount of tax Texas Monthly had paid, plus interest. Id., at 43.

The Court of Appeals, Third Supreme Judicial District of Texas, reversed by a 2-to-1 vote. 731 S. W. 2d 160 (1987). Applying the tripartite test enunciated in Lemon v. Kurtzman, 403 U. S. 602, 612–613 (1971), the court held, first, that the exemption served the secular purpose of preserving separation between church and state. Second, the court asserted that the exemption did not have the primary effect of advancing or inhibiting religion, because "the effect of religious tax exemptions such as § 151.312 is to permit religious organizations to be independent of government support or sanction." 731 S. W. 2d, at 163. The court considered it irrele-

vant that the exemption did not extend to other nonprofit or secular publications, because "the *neutrality* toward religion effected by the grant of an exemption for religious periodicals" remained unaffected by the provision or denial of a similar exemption for nonreligious publications. *Id.*, at 164. Finally, the court concluded that the exemption did not produce impermissible government entanglement with religion. Rather than scrutinize each publication for which a publisher sought an exemption for conformity with the statute's terms, the court found, the Comptroller's Office merely required that a group applying for an exemption demonstrate that it was a religious organization. Once a satisfactory showing had been made, the Comptroller's Office did not later reassess the group's status as a religious organization. It further allowed the group to determine, without review by the State, which of its publications promulgated the teaching of its faith. Because the exemption was administered to minimize state entanglement with religion, the court thought it consistent with *Lemon*'s third prong.

In addition, the court rejected Texas Monthly's claim that the exemption violated the Free Press Clause because it discriminated among publications on the basis of their content. The court read our decision in *Arkansas Writers' Project, Inc.* v. *Ragland*, 481 U. S. 221 (1987), to preclude only those taxes that are imposed solely on the press or targeted at a small group within the press. Because Texas' exemption encompassed only a minority of publications, leaving the bulk of subscription sales subject to tax, the court reasoned that it escaped the strictures of the Free Press Clause as we had interpreted it.

We noted probable jurisdiction, 485 U. S. 958 (1988), and now reverse.

## II

As a preliminary matter, Texas argues that appellant lacks standing to challenge the constitutionality of the exemption. It claims that if this Court were to declare the exemption

8

invalid, the proper course under state law would be to remove the exemption for religious publications, rather than extend it to nonreligious periodicals or strike down the sales and use tax in its entirety. If Texas is right, appellant cannot obtain a refund of the tax it paid under protest. Nor can it qualify for injunctive relief, because its subscription sales are no longer taxed. Hence, Texas contends, appellant cannot show that it has suffered or is threatened with redressable injury, which this Court declared to be a prerequisite for standing in *Valley Forge Christian College* v. *Americans United for Separation of Church & State, Inc.*, 454 U. S. 464, 472 (1982).

The State's contention is misguided. In *Arkansas Writers' Project, supra*, at 227, we rejected a similar argument, "for it would effectively insulate underinclusive statutes from constitutional challenge, a proposition we soundly rejected in *Orr* v. *Orr*, 440 U. S. 268, 272 (1979)." It is not for us to decide whether the correct response as a matter of state law to a finding that a state tax exemption is unconstitutional is to eliminate the exemption, to curtail it, to broaden it, or to invalidate the tax altogether. Nor does it make any difference—contrary to the State's suggestion—that Texas Monthly seeks only a refund and not prospective relief, as did the appellant in *Arkansas Writers' Project*. A live controversy persists over Texas Monthly's right to recover the $149,107.74 it paid, plus interest. Texas cannot strip appellant of standing by changing the law after taking its money.

### III

In proscribing all laws "respecting an establishment of religion," the Constitution prohibits, at the very least, legislation that constitutes an endorsement of one or another set of religious beliefs or of religion generally. It is part of our settled jurisprudence that "the Establishment Clause prohibits government from abandoning secular purposes in order to put an imprimatur on one religion, or on religion as such, or

to favor the adherents of any sect or religious organization." *Gillette* v. *United States*, 401 U. S. 437, 450 (1971). See, *e. g., School Dist. of Grand Rapids* v. *Ball*, 473 U. S. 373, 381 (1985); *Wallace* v. *Jaffree*, 472 U. S. 38, 52–53, and n. 37 (1985); *Welsh* v. *United States*, 398 U. S. 333, 356–357 (1970) (Harlan, J., concurring in result); *Epperson* v. *Arkansas*, 393 U. S. 97, 103–104 (1968); *Abington School Dist.* v. *Schempp*, 374 U. S. 203, 216–217 (1963); *Torcaso* v. *Watkins*, 367 U. S. 488, 495 (1961); *Everson* v. *Board of Education of Ewing*, 330 U. S. 1, 15–16 (1947). The core notion animating the requirement that a statute possess "a secular legislative purpose" and that "its principal or primary effect . . . be one that neither advances nor inhibits religion," *Lemon* v. *Kurtzman*, 403 U. S., at 612, is not only that government may not be overtly hostile to religion but also that it may not place its prestige, coercive authority, or resources behind a single religious faith or behind religious belief in general, compelling nonadherents to support the practices or proselytizing of favored religious organizations and conveying the message that those who do not contribute gladly are less than full members of the community.[1]

---

[1] JUSTICE O'CONNOR's concurrence in *Wallace* v. *Jaffree*, 472 U. S. 38 (1985), properly emphasized this point:

"[T]he Establishment Clause is infringed when the government makes adherence to religion relevant to a person's standing in the political community. Direct government action endorsing religion or a particular religious practice is invalid under this approach because it 'sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community.' [*Lynch* v. *Donnelly*, 465 U. S. 668, 688 (1984) (O'CONNOR, J., concurring).] Under this view, *Lemon*'s inquiry as to the purpose and effect of a statute requires courts to examine whether government's purpose is to endorse religion and whether the statute actually conveys a message of endorsement." *Id.*, at 69.

See also *Lynch* v. *Donnelly*, 465 U. S. 668, 701 (1984) (BRENNAN, J., dissenting) (the Establishment Clause was designed to prevent "religious chauvinism" that tells "minority religious groups, as well as . . . those who

It does not follow, of course, that government policies with secular objectives may not incidentally benefit religion. The nonsectarian aims of government and the interests of religious groups often overlap, and this Court has never required that public authorities refrain from implementing reasonable measures to advance legitimate secular goals merely because they would thereby relieve religious groups of costs they would otherwise incur. See *Mueller* v. *Allen*, 463 U. S. 388, 393 (1983). Nor have we required that legislative categories make no explicit reference to religion. See *Wallace* v. *Jaffree*, *supra*, at 70 (O'CONNOR, J., concurring in judgment) ("The endorsement test does not preclude government from acknowledging religion or from taking religion into account in making law and policy"); *Lynch* v. *Donnelly*, 465 U. S. 668, 715 (1984) (BRENNAN, J., dissenting). Government need not resign itself to ineffectual diffidence because of exaggerated fears of contagion of or by religion, so long as neither intrudes unduly into the affairs of the other.

Thus, in *Widmar* v. *Vincent*, 454 U. S. 263 (1981), we held that a state university that makes its facilities available to registered student groups may not deny equal access to a registered student group desiring to use those facilities for religious worship or discussion. Although religious groups benefit from access to university facilities, a state university may not discriminate against them based on the content of their speech, and the university need not ban all student group meetings on campus in order to avoid providing any assistance to religion. Similarly, in *Mueller* v. *Allen*, *supra*, we upheld a state income tax deduction for the cost of tuition, transportation, and nonreligious textbooks paid by a taxpayer for the benefit of a dependent. To be sure, the deduction aided parochial schools and parents whose children attended them, as well as nonsectarian private schools and their pupils' parents. We did not conclude, however, that

---

may reject all religion, . . . that their views are not similarly worthy of public recognition nor entitled to public support").

this subsidy deprived the law of an overriding secular purpose or effect.   And in the case most nearly on point, *Walz* v. *Tax Comm'n of New York City*, 397 U. S. 664 (1970), we sustained a property tax exemption that applied to religious properties no less than to real estate owned by a wide array of nonprofit organizations, despite the sizable tax savings it accorded religious groups.

In all of these cases, however, we emphasized that the benefits derived by religious organizations flowed to a large number of nonreligious groups as well.   Indeed, were those benefits confined to religious organizations, they could not have appeared other than as state sponsorship of religion; if that were so, we would not have hesitated to strike them down for lacking a secular purpose and effect.   See, *e. g.*, *School Dist. of Grand Rapids* v. *Ball*, *supra* (invalidating state-funded educational programs in private schools, where 40 of the 41 beneficiaries were religious schools); *Estate of Thornton* v. *Caldor, Inc.*, 472 U. S. 703 (1985) (finding violative of the Establishment Clause a statute providing Sabbath observers with an unconditional right not to work on their chosen Sabbath).

In *Widmar* v. *Vincent*, we noted that an open forum in a public university would not betray state approval of religion so long as the forum was available "to a broad class of nonreligious as well as religious speakers."   454 U. S., at 274. "The provision of benefits to so broad a spectrum of groups," we said, "is an important index of secular effect."   *Ibid.*   We concluded that the primary effect of an open forum would not be to advance religion, "[a]t least in the absence of empirical evidence that religious groups will dominate" it.   *Id.*, at 275. Likewise, in *Mueller* v. *Allen*, we deemed it "particularly significant," 463 U. S., at 396, that "the deduction is available for educational expenses incurred by *all* parents, including those whose children attend public schools and those whose children attend nonsectarian private schools or sectarian private schools."   *Id.*, at 397.

Finally, we emphasized in *Walz* that in granting a property tax deduction, the State "has not singled out one particular church or religious group or even churches as such; rather, it has granted exemption to all houses of religious worship within a broad class of property owned by nonprofit, quasi-public corporations which include hospitals, libraries, playgrounds, scientific, professional, historical, and patriotic groups." 397 U. S., at 673. The breadth of New York's property tax exemption was essential to our holding that it was "not aimed at establishing, sponsoring, or supporting religion," *id.*, at 674, but rather possessed the legitimate secular purpose and effect of contributing to the community's moral and intellectual diversity and encouraging private groups to undertake projects that advanced the community's well-being and that would otherwise have to be funded by tax revenues or left undone.[2]   Moreover, "[t]he scheme [was]

---

[2] Although we found it "unnecessary to justify the tax exemption on the social welfare services or 'good works' that some churches perform for parishioners and others," *Walz* v. *Tax Comm'n*, 397 U. S., at 674, we in no way intimated that the exemption would have been valid had it applied *only* to the property of religious groups or had it lacked a permissible secular objective.   Rather, we concluded that the State might reasonably have determined that religious groups generally contribute to the cultural and moral improvement of the community, perform useful social services, and enhance a desirable pluralism of viewpoint and enterprise, just as do the host of other nonprofit organizations that qualified for the exemption.   It is because the set of organizations defined by these secular objectives was so large that we saw no need to inquire into the secular benefits provided by religious groups that sought to avail themselves of the exemption.   In addition, we noted that inquiry into the particular contributions of each religious group "would introduce an element of governmental evaluation and standards as to the worth of particular social welfare programs, thus producing a kind of continuing day-to-day relationship which the policy of neutrality seeks to minimize." *Ibid.*   We therefore upheld the State's classification of religious organizations among the socially beneficial associations whose activities it desired to foster.   Had the State defined the class of subsidized activities more narrowly—to encompass only "charitable" works, for example—more searching scrutiny would have been necessary, notwithstanding the greater intermingling of government and religion that

not designed to inject any religious activity into a nonreligious context, as was the case with school prayers. No particular activity of a religious organization—for example, the propagation of its beliefs—[was] specially promoted by the exemptions." *Id.*, at 689 (BRENNAN, J., concurring). As Justice Harlan observed:

> "To the extent that religious institutions sponsor the secular activities that this legislation is designed to promote, it is consistent with neutrality to grant them an exemption just as other organizations devoting resources to these projects receive exemptions. . . . As long as the breadth of exemption includes groups that pursue cultural, moral, or spiritual improvement in multifarious secular ways, including, I would suppose, groups whose avowed tenets may be antitheological, atheistic, or agnostic, I can see no lack of neutrality in extending the benefit of the exemption to organized religious groups."[3] *Id.*, at 697 (separate opinion) (footnote omitted).

would likely result. Cf. *id.*, at 697, n. 1 (opinion of Harlan, J.); *Bob Jones University* v. *United States*, 461 U. S. 574, 591–592, and n. 18 (1983).

[3] The dissent's accusation that we have distorted or misdescribed the Court's holding in *Walz*, *post*, at 33–38, is simply mistaken. The Court expressly stated in *Walz* that the legislative purpose of New York's property tax exemption was *not* to accommodate religion. Rather, "New York, in common with the other States, has determined that certain entities that exist in a harmonious relationship to the community at large, and that foster its 'moral or mental improvement,' should not be inhibited in their activities by property taxation or the hazard of loss of those properties for nonpayment of taxes." 397 U. S., at 672. Churches, we found, were reasonably classified among a diverse array of nonprofit groups that promoted this end. But it was only because churches, along with numerous other groups, produced these public benefits that we approved their exemption from property tax. The Court said quite plainly: "The State has an affirmative policy that considers these groups as beneficial and stabilizing influences in community life and finds this classification useful, desirable, and in the public interest. Qualification for tax exemption is not perpetual or immutable; some tax-exempt groups lose that status when their activities

Texas' sales tax exemption for periodicals published or distributed by a religious faith and consisting wholly of writings promulgating the teaching of the faith lacks sufficient breadth to pass scrutiny under the Establishment Clause. Every tax exemption constitutes a subsidy that affects nonqualifying taxpayers, forcing them to become "indirect and vicarious 'donors.'" *Bob Jones University* v. *United States*, 461 U. S. 574, 591 (1983). See also *Regan* v. *Taxation with Representation of Wash.*, 461 U. S. 540, 544 (1983). Insofar as that subsidy is conferred upon a wide array of nonsectarian groups as well as religious organizations in pursuit of some legitimate secular end,[4] the fact that religious groups

take them outside the classification and new entities can come into being and qualify for exemption." *Id.*, at 673. Although the concurring opinions in *Walz* amplified this point, the opinion for the Court relied on it as well in determining that the tax exemption possessed a valid secular purpose.

Nor is our reading of *Walz* by any means novel. Indeed, it has been the Court's accepted understanding of the holding in *Walz* for almost 20 years. In *Gillette* v. *United States*, 401 U. S. 437, 454 (1971), we said: "'Neutrality' in matters of religion is not inconsistent with 'benevolence' by way of exemptions from onerous duties, *Walz* v. *Tax Comm'n*, 397 U. S., at 669, so long as an exemption is tailored broadly enough that it reflects valid secular purposes." We read *Walz* to stand for the same proposition in *Committee for Public Education and Religious Liberty* v. *Nyquist*, 413 U. S. 756, 793–794 (1973). "Without intimating whether this factor alone might have controlling significance in another context in some future case," we noted that the breadth of an exemption for religious groups is unquestionably an "important factor" in assessing its constitutionality. *Id.*, at 794. Our opinion today builds on established precedents; it does not repudiate them.

[4] The fact that Texas grants other sales tax exemptions (*e. g.*, for sales of food, agricultural items, and property used in the manufacture of articles for ultimate sale) for *different* purposes does not rescue the exemption for religious periodicals from invalidation. What is crucial is that any subsidy afforded religious organizations be warranted by some overarching secular purpose that justifies like benefits for nonreligious groups. There is no evidence in the record, and Texas does not argue in its brief to this Court, that the exemption for religious periodicals was grounded in some secular legislative policy that motivated similar tax breaks for nonreligious activi-

benefit incidentally does not deprive the subsidy of the secular purpose and primary effect mandated by the Establishment Clause. However, when government directs a subsidy exclusively to religious organizations that is not required by the Free Exercise Clause and that either burdens nonbeneficiaries markedly or cannot reasonably be seen as removing a significant state-imposed deterrent to the free exercise of religion, as Texas has done, see *infra*, at 17–20, it "provide[s] unjustifiable awards of assistance to religious organizations" and cannot but "conve[y] a message of endorsement" to slighted members of the community. *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints* v. *Amos*, 483 U. S. 327, 348 (1987) (O'CONNOR, J., concurring in judgment). This is particularly true where, as here, the subsidy is targeted at writings that *promulgate* the teachings of religious faiths.[5] It is difficult to view Texas' narrow exemption as anything but state sponsorship of religious belief, regardless of whether one adopts the perspective of beneficiaries or of uncompensated contributors.

How expansive the class of exempt organizations or activities must be to withstand constitutional assault depends upon the State's secular aim in granting a tax exemption. If the State chose to subsidize, by means of a tax exemption, all groups that contributed to the community's cultural, intellectual, and moral betterment, then the exemption for religious publications could be retained, provided that the exemption swept as widely as the property tax exemption we upheld in

---

ties. It certainly appears that the exemption was intended to benefit religion alone.

[5] Not only did the property tax exemption sustained in *Walz* v. *Tax Comm'n of New York City*, 397 U. S. 664 (1970), extend to a large number of nonreligious organizations that ostensibly served an expressly articulated secular objective that religious groups could reasonably be thought to advance as well; it also failed to single out religious proselytizing as an activity deserving of public assistance.

*Walz.*[6] By contrast, if Texas sought to promote reflection and discussion about questions of ultimate value and the contours of a good or meaningful life, then a tax exemption would have to be available to an extended range of associations whose publications were substantially devoted to such matters; the exemption could not be reserved for publications dealing solely with religious issues, let alone restricted to publications advocating rather than criticizing religious belief or activity, without signaling an endorsement of religion that is offensive to the principles informing the Establishment Clause. See *Estate of Thornton* v. *Caldor, Inc.,* 472 U. S., at 711 (O'CONNOR, J., concurring) (because the statute bestows an advantage on Sabbath observers "without according similar accommodation to ethical and religious beliefs and practices of other private employees," "[t]he message conveyed is one of endorsement of a particular religious belief, to the detriment of those who do not share it"; the statute therefore "has the effect of advancing religion, and cannot withstand Establishment Clause scrutiny"); *Welsh* v. *United States,* 398 U. S., at 356–361 (Harlan, J., concurring in result) (conscientious objector status cannot be limited to those whose opposition to war has religious roots, but must extend to those whose convictions have purely moral or philosophical sources).

It is not our responsibility to specify which permissible secular objectives, if any, the State should pursue to justify a tax exemption for religious periodicals. That charge rests with the Texas Legislature. Our task, and that of the Texas courts, is rather to ensure that any scheme of exemptions

---

[6] Texas' sales and use tax provides a model of such an exemption when it frees, *inter alia,* organizations "created for religious, educational, or charitable purposes" from the payment of sales and use tax on items they purchase, rent, or consume. Tex. Tax Code Ann. § 151.310(a)(1) (1982). In view of this provision, the special exemption for publications carrying religious messages suggests even more strongly the State's sponsorship of religion.

adopted by the legislature does not have the purpose or effect of sponsoring certain religious tenets or religious belief in general. As Justice Harlan remarked: "The Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders. In any particular case the critical question is whether the circumference of legislation encircles a class so broad that it can be fairly concluded that religious institutions could be thought to fall within the natural perimeter." *Walz*, 397 U. S., at 696 (separate opinion). Because Texas' sales tax exemption for periodicals promulgating the teaching of any religious sect lacks a secular objective that would justify this preference along with similar benefits for nonreligious publications or groups, and because it effectively endorses religious belief, the exemption manifestly fails this test.[7]

## IV

### A

In defense of its sales tax exemption for religious publications, Texas claims that it has a compelling interest in avoiding violations of the Free Exercise and Establishment Clauses, and that the exemption serves that end. Without such an exemption, Texas contends, its sales tax might trammel free exercise rights, as did the flat license tax this Court struck down as applied to proselytizing by Jehovah's Witnesses in *Murdock* v. *Pennsylvania*, 319 U. S. 105 (1943). In addition, Texas argues that an exemption for religious publications neither advances nor inhibits religion, as required by the Establishment Clause, and that its elimination would entangle church and state to a greater degree than the exemption itself.

---

[7] In light of this holding, we need not address Texas Monthly's contention that the sales tax exemption also violates the Free Press Clause as we interpreted it in *Arkansas Writers' Project, Inc.* v. *Ragland*, 481 U. S. 221 (1987).

18

We reject both parts of this argument. Although Texas may widen its exemption consonant with some legitimate secular purpose, nothing in our decisions under the Free Exercise Clause prevents the State from eliminating altogether its exemption for religious publications. "It is virtually self-evident that the Free Exercise Clause does not require an exemption from a governmental program unless, at a minimum, inclusion in the program actually burdens the claimant's freedom to exercise religious rights." *Tony and Susan Alamo Foundation* v. *Secretary of Labor*, 471 U. S. 290, 303 (1985) (citations omitted). In this case, the State has adduced no evidence that the payment of a sales tax by subscribers to religious periodicals or purchasers of religious books would offend their religious beliefs or inhibit religious activity. The State therefore cannot claim persuasively that its tax exemption is compelled by the Free Exercise Clause in even a single instance, let alone in every case. No concrete need to accommodate religious activity has been shown.[8]

---

[8] Contrary to the dissent's claims, *post*, at 29–30, 38, 42, we in no way suggest that *all* benefits conferred exclusively upon religious groups or upon individuals on account of their religious beliefs are forbidden by the Establishment Clause unless they are mandated by the Free Exercise Clause. Our decisions in *Zorach* v. *Clauson*, 343 U. S. 306 (1952), and *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints* v. *Amos*, 483 U. S. 327 (1987), offer two examples. Similarly, if the Air Force provided a sufficiently broad exemption from its dress requirements for servicemen whose religious faiths commanded them to wear certain headgear or other attire, see *Goldman* v. *Weinberger*, 475 U. S. 503 (1986), that exemption presumably would not be invalid under the Establishment Clause even though this Court has not found it to be required by the Free Exercise Clause.

All of these cases, however, involve legislative exemptions that did not, or would not, impose substantial burdens on nonbeneficiaries while allowing others to act according to their religious beliefs, or that were designed to alleviate government intrusions that might significantly deter adherents of a particular faith from conduct protected by the Free Exercise Clause. New York City's decision to release students from public schools so that

Moreover, even if members of some religious group succeeded in demonstrating that payment of a sales tax—or, less plausibly, of a sales tax when applied to printed matter—would violate their religious tenets, it is by no means obvious that the State would be required by the Free Exercise Clause to make individualized exceptions for them. In *United States* v. *Lee*, 455 U. S. 252 (1982), we ruled unanimously that the Federal Government need not exempt an Amish employer from the payment of Social Security taxes, notwithstanding our recognition that compliance would offend his religious beliefs. We noted that "[n]ot all burdens on religion are unconstitutional," *id.*, at 257, and held that "[t]he state may justify a limitation on religious liberty by showing that it is essential to accomplish an overriding governmental interest." *Id.*, at 257–258. Although the balancing test we set forth in *Lee* must be performed on a case-by-case basis, a State's interest in the uniform collection of a

they might obtain religious instruction elsewhere, which we upheld in *Zorach*, was found not to coerce students who wished to remain behind to alter their religious beliefs, nor did it impose monetary costs on their parents or other taxpayers who opposed, or were indifferent to, the religious instruction given to students who were released. The hypothetical Air Force uniform exemption also would not place a monetary burden on those required to conform to the dress code or subject them to any appreciable privation. And the application of Title VII's exemption for religious organizations that we approved in *Corporation of Presiding Bishop*, though it had some adverse effect on those holding or seeking employment with those organizations (if not on taxpayers generally), prevented potentially serious encroachments on protected religious freedoms.

Texas' tax exemption, by contrast, does not remove a demonstrated and possibly grave imposition on religious activity sheltered by the Free Exercise Clause. Moreover, it burdens nonbeneficiaries by increasing their tax bills by whatever amount is needed to offset the benefit bestowed on subscribers to religious publications. The fact that such exemptions are of long standing cannot shield them from the strictures of the Establishment Clause. As we said in *Walz* v. *Tax Comm'n*, 397 U. S., at 678, "no one acquires a vested or protected right in violation of the Constitution by long use, even when that span of time covers our entire national existence and indeed predates it."

sales tax appears comparable to the Federal Government's interest in the uniform collection of Social Security taxes, and mandatory exemptions under the Free Exercise Clause are arguably as difficult to prove. No one has suggested that members of any of the major religious denominations in the United States—the principal beneficiaries of Texas' tax exemption—could demonstrate an infringement of their free exercise rights sufficiently serious to overcome the State's countervailing interest in collecting its sales tax.

## B

Texas' further claim that the Establishment Clause mandates, or at least favors, its sales tax exemption for religious periodicals is equally unconvincing. Not only does the exemption seem a blatant endorsement of religion, but it appears, on its face, to produce greater state entanglement with religion than the denial of an exemption. As JUSTICE STEVENS has noted: "[There exists an] overriding interest in keeping the government—whether it be the legislature or the courts—out of the business of evaluating the relative merits of differing religious claims. The risk that governmental approval of some and disapproval of others will be perceived as favoring one religion over another is an important risk the Establishment Clause was designed to preclude." *Id.*, at 263, n. 2 (concurring in judgment). See *Bob Jones University* v. *United States*, 461 U. S., at 604, n. 30. The prospect of inconsistent treatment and government embroilment in controversies over religious doctrine seems especially baleful where, as in the case of Texas' sales tax exemption, a statute requires that public officials determine whether some message or activity is consistent with "the teaching of the faith." See, *e. g.*, *Jones* v. *Wolf*, 443 U. S. 595 (1979); *Serbian Eastern Orthodox Diocese* v. *Milivojevich*, 426 U. S. 696 (1976); *Presbyterian Church in U. S.* v. *Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U. S. 440 (1969).[9]

---

[9] At trial, Texas' Supervisor for Sales Tax Policy testified that the Comptroller's Office did not in fact heed the statutory command to grant

While Texas is correct in pointing out that compliance with government regulations by religious organizations and the monitoring of their compliance by government agencies would itself enmesh the operations of church and state to some degree, we have found that such compliance would generally not impede the evangelical activities of religious groups and that the "routine and factual inquiries" commonly associated with the enforcement of tax laws "bear no resemblance to the kind of government surveillance the Court has previously held to pose an intolerable risk of government entanglement with religion." *Tony and Susan Alamo Foundation* v. *Secretary of Labor*, 471 U. S., at 305.

On the record before us, neither the Free Exercise Clause nor the Establishment Clause prevents Texas from withdrawing its current exemption for religious publications if it chooses not to expand it to promote some legitimate secular aim.

## C

Our conclusion today is admittedly in tension with some unnecessarily sweeping statements in *Murdock* v. *Pennsylvania*, 319 U. S. 105 (1943), and *Follett* v. *McCormick*, 321 U. S. 573 (1944). To the extent that language in those opinions is inconsistent with our decision here, based on the evolution in our thinking about the Religion Clauses over the last 45 years, we disavow it.

---

exemptions only for publications that promulgated the teaching of a particular faith; instead, the Office allowed religious publishers or distributors to determine whether their publications qualified for the exemption. App. 60–61. Although this approach undoubtedly reduced the degree of state entanglement in religious affairs from that which would have resulted from strict application of the statute, we cannot attach great significance to current administrative practice. That practice has not been embodied in the regulation corresponding to the statutory exemption, which repeats almost verbatim the words of the statute. 34 Tex. Admin. Code § 3.299(d) (1986). It is, moreover, at odds with the plain statutory language. It would appear open to future administrators to subject the content of religious publications to more exacting scrutiny.

In *Murdock*, the Court ruled that a city could not impose a flat license tax payable by "all persons canvassing for or soliciting . . . orders for goods, paintings, pictures, wares, or merchandise of any kind" on Jehovah's Witnesses who "went about from door to door . . . distributing literature and soliciting people to 'purchase' certain religious books and pamphlets." 319 U. S., at 106. In *Follett*, the Court ruled similarly that a Jehovah's Witness who "went from house to house distributing certain books" was exempt under the Free Exercise Clause from payment of a flat business and occupation tax on booksellers. 321 U. S., at 574. In both cases, the majority stated that the "sale" of religious pamphlets by itinerant evangelists was a form of *preaching, Murdock, supra*, at 109; *Follett, supra*, at 577, and that imposing a license or occupation tax on such a preacher was tantamount to exacting "a tax from him for the privilege of delivering a sermon." *Murdock*, 319 U. S., at 112. The Court acknowledged that imposing an income or property tax on preachers would not be unconstitutional. *Ibid.* It emphasized, however, that a flat license or occupation tax poses a greater threat to the free exercise of religion than do those other taxes, because it is "levied and collected as a condition to the pursuit of activities whose enjoyment is guaranteed by the First Amendment" and thus "restrains in advance those constitutional liberties . . . and inevitably tends to suppress their exercise." *Id.*, at 114. See *Follett, supra*, at 575.

If one accepts the majority's characterization of the critical issues in *Murdock* and *Follett*, those decisions are easily compatible with our holding here. In striking down application of the town ordinance to Jehovah's Witnesses in *Follett*—an ordinance the Court found to be "in all material respects the same," 321 U. S., at 574, as the one whose application it restricted in *Murdock*—the Court declared that only a single "narrow" question was presented: "It is whether a flat license tax as applied to one who earns his livelihood as an evangelist or preacher in his home town is constitutional." 321 U. S.,

at 576.  Regarding *Follett* in this light, we must agree that "we have quite a different case from that of a merchant who sells books-at a stand or on the road."  *Ibid.*  There is no doubt that the First Amendment prevents both the States and the Federal Government from imposing a special occupation tax exclusively on those who devote their days to spreading religious messages.  Moreover, it is questionable whether, consistent with the Free Exercise Clause, government may exact a facially neutral license fee designed for commercial salesmen from religious missionaries whose principal work is preaching and who only occasionally sell religious tracts for small sums, so long as "the fee is not a nominal one, imposed as a regulatory measure and calculated to defray the expense of protecting those on the streets and at home against the abuses of solicitors."  *Murdock, supra,* at 116.  In such a case, equal treatment of commercial and religious solicitation might result in an unconstitutional imposition on religious activity warranting judicial relief, particularly where that activity is deemed central to a given faith, as the Court found this form of proselytizing to be in *Murdock* and *Follett*, and where the tax burden is far from negligible.[10]

---

[10] In *Murdock* v. *Pennsylvania*, 319 U. S., at 109, n. 7, the Court noted that Seventh-day Adventist missionaries, who sold religious literature while proselytizing door to door in a manner akin to Jehovah's Witnesses, earned on average only $65 per month in 1941, half of which they were permitted to keep in order to pay their traveling and living expenses.  The license fee whose application was challenged in *Murdock* amounted to $1.50 for one day, $7 for one week, $12 for two weeks, and $20 for three weeks. *Id.*, at 106.  If towns were permitted to levy such fees from itinerant preachers whose average earnings totaled only $32.50 per month before income taxes because their sales of religious literature were merely incidental to their primary evangelical mission, then they could easily throttle such missionary work.  A Seventh-day Adventist who spent each day in a different town would have to pay $45 in fees over the course of a 30-day month; if his income were only $32.50, he could not even afford the necessary licenses, let alone support himself once he had met his legal obligations.

Insofar as the Court's holdings in *Murdock* and *Follett* are limited to these points, they are plainly consistent with our decision today. The sales tax that Texas imposes is not an occupation tax levied on religious missionaries. Nor is it a flat tax that "restrains in advance," 319 U. S., at 114, the free exercise of religion. On the contrary, because the tax is equal to a small fraction of the value of each sale and payable by the buyer, it poses little danger of stamping out missionary work involving the sale of religious publications, and in view of its generality it can hardly be viewed as a covert attempt to curtail religious activity. We therefore see no inconsistency between our former decisions and our present holding.

To the extent that our opinions in *Murdock* and *Follett* might be read, however, to suggest that the States and the Federal Government may never tax the sale of religious or other publications, we reject those dicta.[11] Our intervening decisions make clear that even if the denial of tax benefits "will inevitably have a substantial impact" on religious groups, the refusal to grant such benefits does not offend the Free Exercise Clause when it does not prevent those groups "from observing their religious tenets." *Bob Jones Univer-*

---

[11] For example, in *Murdock, supra,* at 111, the Court wrote: "The constitutional rights of those spreading their religious beliefs through the spoken and printed word are not to be gauged by standards governing retailers or wholesalers of books. The right to use the press for expressing one's views is not to be measured by the protection afforded commercial handbills. . . . Freedom of speech, freedom of the press, freedom of religion are available to all, not merely to those who can pay their own way." In our view, this passage suggests nothing more than that commercial speech is on a different footing for constitutional purposes than other types of speech. Reading it to bar all taxes that might impede the dissemination of printed messages other than commercial advertisements would go well beyond the language of the passage and be difficult to reconcile with the Court's approval of income and property taxes levied on preachers (and presumably political pamphleteers or literary authors). 319 U. S., at 112. In any event, we reject this broad reading, whether or not the Court intended the passage to bear that meaning.

*sity* v. *United States*, 461 U. S., at 603–604. In *Murdock* and *Follett*, the application of a flat license or occupation tax to Jehovah's Witnesses arguably did prevent adherents of that sect from acting in accordance with some of their central religious beliefs, in the absence of any overriding government interest in denying them an exemption.[12] In the much more common circumstances exemplified by this case, however, taxes or regulations would not subject religious organizations to undue burdens and the government's interest in their uniform application is far weightier. Hence, there is no bar to Texas' imposing a general sales tax on religious publications.

## V

We conclude that Texas' sales tax exemption for religious publications violates the First Amendment, as made applicable to the States by the Fourteenth Amendment. Accordingly, the judgment of the Texas Court of Appeals is reversed, and the case is remanded for further proceedings.

*It is so ordered.*

JUSTICE WHITE, concurring in the judgment.

The Texas law at issue here discriminates on the basis of the content of publications: it provides that "[p]eriodicals . . . that consist wholly of writings promulgating the teaching of (a religious faith) . . . are exempted" from the burdens of the sales tax law. Tex. Tax Code Ann. § 151.312 (1982). Thus,

---

[12] Thus, the Court noted in *Murdock, supra*, at 109, that the proselytizing done by Jehovah's Witnesses "is as evangelical as the revival meeting" and "occupies the same high estate under the First Amendment as do worship in the churches and preaching from the pulpits." The Court further emphasized that the dissemination of their views in this manner was not adventitious to Jehovah's Witnesses' primary beliefs, but rather was regarded by them as a duty imposed on them by God. 319 U. S., at 108. For its part, the city defended its tax as a legitimate levy on *commercial* activity, *id.*, at 110, and apparently never contended that exceptions for religious evangelists would cause administrative difficulties or produce excessive state entanglement with religion.

the content of a publication determines whether its publisher is exempt or nonexempt. Appellant is subject to the tax, but other publications are not because of the message they carry. This is plainly forbidden by the Press Clause of the First Amendment. *Arkansas Writers' Project, Inc.* v. *Ragland*, 481 U. S. 221 (1987), our most recent decision to this effect, is directly applicable here, and is the proper basis for reversing the judgment below.

JUSTICE BLACKMUN, with whom JUSTICE O'CONNOR joins, concurring in the judgment.

The Texas statute at issue touches upon values that underlie three different Clauses of the First Amendment: the Free Exercise Clause, the Establishment Clause, and the Press Clause. As indicated by the number of opinions issued in this case today, harmonizing these several values is not an easy task.

The Free Exercise Clause value suggests that a State may not impose a tax on spreading the gospel. See *Follett* v. *McCormick*, 321 U. S. 573 (1944), and *Murdock* v. *Pennsylvania*, 319 U. S. 105 (1943). The Establishment Clause value suggests that a State may not give a tax break to those who spread the gospel that it does not also give to others who actively might advocate disbelief in religion. See *Torcaso* v. *Watkins*, 367 U. S. 488, 495 (1961); *Everson* v. *Board of Education of Ewing*, 330 U. S. 1, 15–16 (1947). The Press Clause value suggests that a State may not tax the sale of some publications, but not others, based on their content, absent a compelling reason for doing so. See *Arkansas Writers' Project, Inc.* v. *Ragland*, 481 U. S. 221, 231 (1987).

It perhaps is fairly easy to reconcile the Free Exercise and Press Clause values. If the Free Exercise Clause suggests that a State may not tax the sale of religious literature by a religious organization, this fact alone would give a State a compelling reason to exclude this category of sales from an otherwise general sales tax. In this respect, I agree gener-

ally with what JUSTICE SCALIA says in Part II of his dissenting opinion.

I find it more difficult to reconcile in this case the Free Exercise and Establishment Clause values. The Free Exercise Clause suggests that a special exemption for religious books is required. The Establishment Clause suggests that a special exemption for religious books is forbidden. This tension between mandated and prohibited religious exemptions is well recognized. See, *e. g.*, *Walz* v. *Tax Comm'n of New York City*, 397 U. S. 664, 668–669 (1970). Of course, identifying the problem does not resolve it.

JUSTICE BRENNAN's opinion, in its Part IV, would resolve the tension between the Free Exercise and Establishment Clause values simply by subordinating the Free Exercise value, even, it seems to me, at the expense of longstanding, precedents. See *ante*, at 21–25 (repudiating *Follett* and *Murdock* to the extent inconsistent with the newfound proposition that a State generally may tax the sale of a Bible by a church). JUSTICE SCALIA's opinion, conversely, would subordinate the Establishment Clause value. This position, it seems to me, runs afoul of the previously settled notion that government may not favor religious belief over disbelief. See, *e. g.*, *Wallace* v. *Jaffree*, 472 U. S. 38, 53 (1985); *Welsh* v. *United States*, 398 U. S. 333, 356 (1970) (Harlan, J., concurring in result); *Epperson* v. *Arkansas*, 393 U. S. 97, 103–104 (1968); *Abington School District* v. *Schempp*, 374 U. S. 203, 218, 220 (1963); *Torcaso* v. *Watkins*, 367 U. S., at 495.

Perhaps it is a vain desire, but I would like to decide the present case without necessarily sacrificing either the Free Exercise Clause value or the Establishment Clause value. It is possible for a State to write a tax-exemption statute consistent with both values: for example, a state statute might exempt the sale not only of religious literature distributed by a religious organization but also of philosophical literature distributed by nonreligious organizations devoted to such matters of conscience as life and death, good and evil, being

and nonbeing, right and wrong. Such a statute, moreover, should survive Press Clause scrutiny because its exemption would be narrowly tailored to meet the compelling interests that underlie both the Free Exercise and Establishment Clauses.

To recognize this possible reconciliation of the competing First Amendment considerations is one thing; to impose it upon a State as its only legislative choice is something else. JUSTICE SCALIA rightly points out, *post*, at 42, that the Free Exercise and Establishment Clauses often appear like Scylla and Charybdis, leaving a State little room to maneuver between them. The Press Clause adds yet a third hazard to a State's safe passage through the legislative waters concerning the taxation of books and journals. We in the Judiciary must be wary of interpreting these three constitutional Clauses in a manner that negates the legislative role altogether.

I believe we can avoid most of these difficulties with a narrow resolution of the case before us. We need not decide today the extent to which the Free Exercise Clause requires a tax exemption for the sale of religious literature by a religious organization; in other words, defining the ultimate scope of *Follett* and *Murdock* may be left for another day. We need decide here only whether a tax exemption *limited to* the sale of religious literature by religious organizations violates the Establishment Clause. I conclude that it does.

In this case, by confining the tax exemption exclusively to the sale of religious publications, Texas engaged in preferential support for the communication of religious messages. Although some forms of accommodating religion are constitutionally permissible, see *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints* v. *Amos*, 483 U. S. 327 (1987), this one surely is not. A statutory preference for the dissemination of religious ideas offends our most basic understanding of what the Establishment Clause is all about and hence is constitutionally intolerable. See *Wallace*

v. *Jaffree*, 472 U. S., at 69–70 (O'CONNOR, J., concurring in judgment); *Epperson* v. *Arkansas*, 393 U. S., at 103–104. Accordingly, whether or not *Follett* and *Murdock* prohibit taxing the sale of religious literature, the Establishment Clause prohibits a tax exemption limited to the sale of religious literature. Cf. *Estate of Thornton* v. *Caldor, Inc.*, 472 U. S. 703 (1985) (the Establishment Clause prohibits a statute that grants employees an unqualified right not to work on their Sabbath), and *Hobbie* v. *Unemployment Appeals Comm'n of Fla.*, 480 U. S. 136, 145–146, and n. 11 (1987) (consistent with *Caldor*, the Free Exercise Clause prohibits denying unemployment compensation to employees who refuse to work on their Sabbath).

At oral argument, appellees suggested that the statute at issue here exempted from taxation the sale of atheistic literature distributed by an atheistic organization. Tr. of Oral Arg. 33. If true, this statute might survive Establishment Clause scrutiny, as well as Free Exercise and Press Clause scrutiny. But, as appellees were quick to concede at argument, the record contains nothing to support this facially implausible interpretation of the statute. *Ibid.* Thus, constrained to construe this Texas statute as exempting religious literature alone, I concur in the holding that it contravenes the Establishment Clause, and in remanding the case for further proceedings not inconsistent with this holding.

JUSTICE SCALIA, with whom THE CHIEF JUSTICE and JUSTICE KENNEDY join, dissenting.

As a judicial demolition project, today's decision is impressive. The machinery employed by the opinions of JUSTICE BRENNAN and JUSTICE BLACKMUN is no more substantial than the antinomy that accommodation of religion may be required but not permitted, and the bold but unsupportable assertion (given such realities as the text of the Declaration of Independence, the national Thanksgiving Day proclaimed by every President since Lincoln, the inscriptions on our coins, the words of our Pledge of Allegiance, the invocation with

which sessions of our Court are opened and, come to think of it, the discriminatory protection of freedom of religion in the Constitution) that government may not "convey a message of endorsement of religion." With this frail equipment, the Court topples an exemption for religious publications of a sort that expressly appears in the laws of at least 15 of the 45 States that have sales and use taxes[1]—States from Maine to Texas, from Idaho to New Jersey.[2] In practice, a similar

---

[1] Only Alaska, Delaware, Montana, New Hampshire, and Oregon do not have state sales taxes.

[2] See Ala. Code § 40–23–62(20) (Supp. 1988) (exempting from use tax "religious magazines and publications"); Fla. Stat. § 212.06(9) (Supp. 1988) (exempting from sales and use tax "the sale or distribution of religious publications, bibles, hymn books, prayer books," and other religious material); Ga. Code Ann. § 48–8–3(15)(A) (Supp. 1988) (exempting from sales tax religious newspapers owned and operated by religious institutions); § 48–8–3(16) (exempting from sales tax sales of "Holy Bibles, testaments and similar books commonly recognized as being Holy Scripture"); Idaho Code § 63–3622I (Supp. 1988) (exempting from sales and use tax the sale of "religious literature, pamphlets, periodicals, tracts, and books" if published and sold by "a bona fide church or religious denomination"); Me. Rev. Stat. Ann., Tit. 36, § 1760(13) (1978) (exempting from sales tax "[s]ales of the Bible and also other books and literature . . . used in and by established churches for religion and prayer"); Md. Ann. Code, Art. 81, § 326(u) (1980) (exempting from sales tax all sales by "bona fide church or religious organization"); Mass. Gen. Laws § 64H:6(m) (1986) (exempting from sales tax "books used for religious worship"); N. J. Stat. Ann. § 54:32B–8.25 (West 1986) (exempting from sales tax "receipts from sales of the Bible or similar sacred scripture"); N. C. Gen. Stat. § 105–164.13(14) (1985) (exempting from sales tax "Holy Bibles"); N. D. Cent. Code § 57–39.2–04(25) (1983) (exempting from sales tax "Bibles, hymnals, textbooks, and prayerbooks" sold to religious organizations); Pa. Stat. Ann., Tit. 72, § 7204(28) (Purdon Supp. 1988–1989) (exempting from sales tax "the sale at retail or use of religious publications . . . and Bibles"); R. I. Gen. Laws § 44–18–30(HH) (Supp. 1987) (exempting from sales tax "any canonized scriptures of any tax-exempt non-profit religious organizations including but not limited to the old testament and new testament versions"); S. C. Code § 12–35–550(7) (Supp. 1988) (exempting from sales and use tax sales "of . . . religious publications, including the Holy Bible"); Tenn. Code Ann. § 67–6–323 (1983) (exempting from sales and use tax sales of "religious publications to

exemption may well exist in even more States than that, since until today our case law has suggested that it is not only permissible but perhaps required. See *Follett* v. *McCormick*, 321 U. S. 573 (1944); *Murdock* v. *Pennsylvania*, 319 U. S. 105 (1943). I expect, for example, that even in States without express exemptions many churches, and many tax assessors, have thought sales taxes inapplicable to the religious literature typically offered for sale in church foyers.

When one expands the inquiry to sales taxes on items other than publications and to other types of taxes such as property, income, amusement, and motor vehicle taxes—all of which are likewise affected by today's holding—the Court's accomplishment is even more impressive. At least 45 States provide exemptions for religious groups without analogous exemptions for other types of nonprofit institutions.[3] For

---

or by churches"); Tex. Tax Code Ann. § 151.312 (1982) (exempting from sales tax religious periodicals and sacred books).

[3] See, in addition to n. 2, *supra*, Ala. Code § 40–9–1(6) (Supp. 1988) (exempting from property tax "libraries of ministers of the gospel" and "all religious books kept for sale by ministers of the gospel and colporteurs"); Alaska Stat. Ann. § 29.45.030(b)(1) (1986) (exempting from property tax residence of "bishop, pastor, priest, rabbi, [or] minister"); Ariz. Rev. Stat. Ann. § 42–1310.14(A) (Supp. 1988–1989) (exempting from transaction privilege tax "projects of bona fide religious . . . institutions"); Ark. Code Ann. § 26–52–401 (Supp. 1987) (extending property tax exemption for religious and charitable institutions to religious recreational centers, day-care centers, and parsonages); Cal. Rev. & Tax. Code Ann. § 6363.5 (West 1987) (exempting from sales tax meals and food products furnished by or served by any religious institution); Colo. Rev. Stat. § 39–3–102 (1982) (establishing special property tax exemption for first $16,000 in valuation of each parsonage); Conn. Gen. Stat. § 12–81(12) (1983) (exempting from personal property tax personal property of "a Connecticut religious organization" used for "religious or charitable purposes"); § 12–81(15) (exempting from property tax homes of clergymen owned by religious organizations); D. C. Code § 47–1002(15) (1987) (exempting from property tax pastoral residences); § 47–1002(16) (exempting from property tax bishops' residences); Ga. Code Ann. § 48–5–41(a)(3) (Supp. 1988) (exempting from property tax residences for pastors owned by religious organizations); Haw. Rev. Stat. § 244D–4(b)(4) (Supp. 1987) (exempting from liquor tax spirits sold or

over half a century the federal Internal Revenue Code has allowed "minister[s] of the gospel" (a term interpreted broadly enough to include cantors and rabbis) to exclude from gross

---

used for "sacramental purposes"); Haw. Rev. Stat. § 246–32(b)(3) (1985) (exempting from property tax parsonages); Idaho Code § 63–3622J (Supp. 1988) (exempting from sales tax sales of meals by churches); Ill. Rev. Stat., ch. 120, ¶ 500.2 (1987) (exempting from property tax parsonages and bishops' residences); Ind. Code § 6-1.1–10–36.3 (1988) (exempting from property tax parsonages); Kan. Stat. Ann. § 79–3602(j) (1984) (exempting from sales tax sale by religious organization "of tangible personal property acquired for . . . resale"); Ky. Const. § 170 (exempting from property tax parsonages); La. Rev. Stat. Ann. § 47:47 (West 1970) (excluding from state income tax rental income of parsonage of "minister of the gospel"); Md. Ann. Code, Art. 81, § 326(c)(i) (1980) (exempting from sales tax sales of food by religious organizations); Mass. Gen. Laws § 59:5, Eleventh (1986) (exempting from local property tax parsonages and official residences of other religious officials); Mich. Comp. Laws § 205.54a(b)(ii) (Supp. 1988–1989) (exempting from sales tax sales of vehicles "used primarily for the transportation of persons for religious purposes"); Mich. Comp. Laws § 211.7s (1986) (exempting from property tax parsonages); Miss. Code Ann. § 27–11–43(b) (Supp. 1988) (exempting from amusement tax programs "composed entirely of gospel singing and not generally mixed with hillbilly or popular singing"); § 27–33–19(d) (exempting from property tax homes of "minister[s] of the gospel"); Mo. Rev. Stat. § 144.450(5) (1986) (exempting from use tax motor vehicles "owned and used by religious organizations" to transfer students to religious schools); Mont. Code Ann. § 15–6–201(b) (1987) (exempting from property tax "residences of the clergy"); Neb. Rev. Stat. § 77–2702(6)(d) (Supp. 1987) (exempting from sales tax occasional sales "by an organization created exclusively for religious purposes"); § 77–2704(1)(g)(ii) (exempting from sales tax meals served by church at church function); Nev. Rev. Stat. § 361.125(1) (1986) (exempting from property tax parsonages); N. H. Rev. Stat. Ann. § 72:23 (III) (1970) (exempting from property tax "church parsonages"); N. H. Rev. Stat. Ann. § 72:23(VI) (Supp. 1988) (exempting religious organizations from reporting requirements for other nonprofit institutions); N. J. Stat. Ann. § 54:4–3.35 (West 1986) (exempting from property tax residences of "district supervisors of religious organizations"); N. M. Stat. Ann. § 7–9–41 (1988) (exempting from receipts tax "receipts of a minister of a religious organization . . . from religious services"); N. Y. Real Prop. Tax Law § 436 (McKinney 1984) (exempting from property tax property held in trust by clergymen); § 462 (exempting from property tax residences of "of-

income the rental value of their parsonages. 26 U. S. C. § 107; see also § 213(b)(11) of the Revenue Act of 1921, ch. 136, 42 Stat. 239. In short, religious tax exemptions of the type the Court invalidates today permeate the state and federal codes, and have done so for many years.

I dissent because I find no basis in the text of the Constitution, the decisions of this Court, or the traditions of our people for disapproving this longstanding and widespread practice.

I

The opinions of JUSTICE BRENNAN and JUSTICE BLACKMUN proceed as though this were a matter of first impression. It is not. Nineteen years ago, in *Walz* v. *Tax Comm'n of New York City*, 397 U. S. 664 (1970), we considered and rejected an Establishment Clause challenge that was in all relevant respects identical. Since today's opinions barely acknowledge the Court's decision in that case (as opposed to the separate concurrences of Justices BRENNAN and Harlan), it requires some discussion here. *Walz* involved

---

ficiating clergymen"); N. D. Cent. Code § 57–02–08(7) (Supp. 1987) (exempting from property tax dwellings of bishops, priests, rectors, or ministers); Okla. Stat., Tit. 68, § 1356(F) (Supp. 1989) (exempting from sales tax sales of meals made "to or by churches"); R. I. Gen. Laws § 44–3–3 (Supp. 1987) (exempting from property tax residences of clergymen); S. D. Codified Laws § 35–5–6(2) (Supp. 1988) (exempting from beverage tax sacramental wine); Tex. Tax Code Ann. §§ 11.20(a)(3) and (4) (Supp. 1988–1989) (exempting from property tax dwellings of religious clergy); Vt. Stat. Ann., Tit. 32, § 3802(4) (1981) (exempting from property tax parsonages for ministers); Va. Code § 58.1–3617 (Supp. 1988) (exempting from property tax vehicles "owned by churches and used for church purposes"); § 58.1–608(38) (exempting from sales tax "property . . . purchased by churches" for use in religious services by a congregation); Wash. Rev. Code § 66.20.020(3) (1987) (exempting from licensing requirements "wine [used] for sacramental purposes"); Wash. Rev. Code § 84.36.020 (1987) (exempting from property tax parsonages); W. Va. Code § 11–3–9 (1987) (exempting from property tax parsonages); Wis. Stat. § 70.11(4) (1985–1986) (exempting from property tax "housing for pastors"); Wyo. Stat. § 39–1–201 (a)(vii) (Supp. 1988) (exempting from property tax "church parsonages").

New York City's grant of tax exemptions, pursuant to a state statute and a provision of the State Constitution, to "religious organizations for religious properties used solely for religious worship." *Id.*, at 666–667, and n. 1. In upholding the exemption, we conducted an analysis that contains the substance of the three-pronged "test" adopted the following Term in *Lemon* v. *Kurtzman*, 403 U. S. 602 (1971). First, we concluded that "[t]he legislative purpose of the property tax exemption is neither the advancement nor the inhibition of religion." 397 U. S., at 672. We reached that conclusion because past cases and the historical record established that property tax exemption "constitutes a reasonable and balanced attempt to guard against" the "latent dangers" of government hostility to religion. *Id.*, at 673. We drew a distinction between an unlawful intent to favor religion and a lawful intent to "'accommodat[e] the public service to [the people's] spiritual needs,'" *id.*, at 672 (quoting *Zorach* v. *Clauson*, 343 U. S. 306, 314 (1952)), and found only the latter to be involved in "sparing the exercise of religion from the burden of property taxation levied on private profit institutions," 397 U. S., at 673.

We further concluded that the exemption did not have the primary effect of sponsoring religious activity. We noted that, although tax exemptions may have the same economic effect as state subsidies, for Establishment Clause purposes such "indirect economic benefit" is significantly different.

> "The grant of a tax exemption is not sponsorship since the government does not transfer part of its revenue to churches but simply abstains from demanding that the church support the state. . . . There is no genuine nexus between tax exemption and establishment of religion." *Id.*, at 675.

JUSTICE BRENNAN also recognized this distinction in his concurring opinion:

"Tax exemptions and general subsidies, however, are qualitatively different. Though both provide economic assistance, they do so in fundamentally different ways. A subsidy involves the direct transfer of public monies to the subsidized enterprise and uses resources exacted from taxpayers as a whole. An exemption, on the other hand, involves no such transfer." *Id.*, at 690 (footnote omitted).

See also *id.*, at 691 ("Tax exemptions . . . constitute mere passive state involvement with religion and not the affirmative involvement characteristic of outright governmental subsidy").

Third, we held that the New York exemption did not produce unacceptable government entanglement with religion. In fact, quite to the contrary. Since the exemptions avoided the "tax liens, tax foreclosures, and the direct confrontations and conflicts that follow in the train of those legal processes," *id.*, at 674, we found that their elimination would increase government's involvement with religious institutions, *id.*, at 674–676. See also *id.*, at 691 (BRENNAN, J., concurring) ("[I]t cannot realistically be said that termination of religious tax exemptions would quantitatively lessen the extent of state involvement with religion").

We recognized in *Walz* that the exemption of religion from various taxes had existed without challenge in the law of all 50 States and the National Government before, during, and after the framing of the First Amendment's Religion Clauses, and had achieved "undeviating acceptance" throughout the 200-year history of our Nation. "Few concepts," we said, "are more deeply embedded in the fabric of our national life, beginning with pre-Revolutionary colonial times, than for the government to exercise at the very least this kind of benevolent neutrality toward churches and religious exercise generally so long as none was favored over others and none suffered interference." *Id.*, at 676–677. See also *id.*, at 681 (BRENNAN, J., concurring) (noting the "the undeviating ac-

ceptance given religious tax exemptions from our earliest days as a Nation").

It should be apparent from this discussion that *Walz*, which we have reaffirmed on numerous occasions in the last two decades, *e. g., Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints* v. *Amos*, 483 U. S. 327 (1987), is utterly dispositive of the Establishment Clause claim before us here. The Court invalidates § 151.312 of the Texas Tax Code only by distorting the holding of that case and radically altering the well-settled Establishment Clause jurisprudence which that case represents.

JUSTICE BRENNAN explains away *Walz* by asserting that "[t]he breadth of New York's property tax exemption was essential to our holding that it was 'not aimed at establishing, sponsoring, or supporting religion.'" *Ante*, at 12 (quoting *Walz*, 397 U. S., at 674). This is not a plausible reading of the opinion. At the outset of its discussion concerning the permissibility of the legislative purpose, the *Walz* Court did discuss the fact that the New York tax exemption applied not just to religions but to certain other "nonprofit" groups, including "hospitals, libraries, playgrounds, scientific, professional, historical, and patriotic groups." *Id.*, at 673. The finding of valid legislative purpose was not rested upon that, however, but upon the more direct proposition that "exemption constitutes a reasonable and balanced attempt to guard against" the "latent dangers" of governmental hostility towards religion "inherent in the imposition of property taxes." *Ibid.* The venerable federal legislation that the Court cited to support its holding was not legislation that exempted religion along with other things, but legislation that exempted *religion alone.* See, *e. g.*, ch. 17, 6 Stat. 116 (1813) (remitting duties paid on the importation of plates for printing Bibles); ch. 91, 6 Stat. 346 (1826) (remitting duties paid on the importation of church vestments, furniture, and paintings); ch. 259, 6 Stat. 600 (1834) (remitting duties paid on the importation of church bells). Moreover, if the Court had in-

tended to rely upon a "breadth of coverage" rationale, it would have had to identify some characteristic that rationally placed religion within the same policy category as the other institutions. JUSTICE BRENNAN's concurring opinion in *Walz* conducted such an analysis, finding the New York exemption permissible only because religions, like the other types of nonprofit organizations exempted, "contribute to the well-being of the community in a variety of nonreligious ways," 397 U. S., at 687, and (incomprehensibly) because they "uniquely contribute to the pluralism of American society by their religious activities," *id.*, at 689. (I say incomprehensibly because to favor religion for its "unique contribution" is to favor religion as religion.) Justice Harlan's opinion conducted a similar analysis, finding that the New York statute "defined a class of nontaxable entities whose common denominator is their nonprofit pursuit of activities devoted to cultural and moral improvement and the doing of 'good works' by performing certain social services in the community that might otherwise have to be assumed by government." *Id.*, at 696. The Court's opinion in *Walz*, however, not only failed to conduct such an analysis, but—seemingly in reply to the concurrences—*explicitly and categorically disavowed reliance upon it,* concluding its discussion of legislative purpose with a paragraph that begins as follows: "We find it unnecessary to justify the tax exemption on the social welfare services or 'good works' that some churches perform for parishioners and others," *id.*, at 674. This should be compared with today's rewriting of *Walz:* "[W]e concluded that the State might reasonably have determined that religious groups generally contribute to the cultural and moral improvement of the community, perform useful social services, and enhance a desirable pluralism of viewpoint and enterprise, just as do the host of other nonprofit organizations that qualified for the exemption." *Ante*, at 12, n. 2. This is a marvellously accurate description of what Justices BRENNAN and Harlan believed, and what the Court specifically re-

jected. The Court did not approve an exemption for charities that happened to benefit religion; it approved an exemption for religion *as* an exemption for religion.

Today's opinions go beyond misdescribing *Walz*, however. In repudiating what *Walz* in fact approved, they achieve a revolution in our Establishment Clause jurisprudence, effectively overruling other cases that were based, as *Walz* was, on the "accommodation of religion" rationale. According to JUSTICE BRENNAN's opinion, no law is constitutional whose "benefits [are] confined to religious organizations," *ante*, at 11—except, of course, those laws that are unconstitutional *unless* they contain benefits confined to religious organizations, see *ante*, at 17–18. See also JUSTICE BLACKMUN's opinion, *ante*, at 28. Our jurisprudence affords no support for this unlikely proposition. *Walz* is just one of a long line of cases in which we have recognized that "the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause." *Hobbie* v. *Unemployment Appeals Comm'n of Fla.*, 480 U. S. 136, 144–145 (1987); see McConnell, Accommodation of Religion, 1985 S. Ct. Rev. 1, 3. In such cases as *Sherbert* v. *Verner*, 374 U. S. 398 (1963), *Wisconsin* v. *Yoder*, 406 U. S. 205 (1972), *Thomas* v. *Review Bd. of Ind. Employment Security Div.*, 450 U. S. 707 (1981), and *Hobbie* v. *Unemployment Appeals Comm'n of Fla.*, *supra*, we held that the Free Exercise Clause of the First Amendment *required* religious beliefs to be accommodated by granting religion-specific exemptions from otherwise applicable laws. We have often made clear, however, that "[t]he limits of permissible state accommodation to religion are by no means coextensive with the noninterference mandated by the Free Exercise Clause." *Walz*, 397 U. S., at 673. See also *Hobbie*, *supra*, at 144–145, and n. 10; *Gillette* v. *United States*, 401 U. S. 437, 453 (1971); *Braunfeld* v. *Brown*, 366 U. S. 599, 605–608 (1961) (plurality opinion); *Wallace* v. *Jaffree*, 472 U. S. 38, 82 (1985) (O'CONNOR, J., concurring).

We applied the accommodation principle, to permit special treatment of religion that was not required by the Free Exercise Clause, in *Zorach* v. *Clauson*, 343 U. S. 306 (1952), where we found no constitutional objection to a New York City program permitting public school children to absent themselves one hour a week for "religious observance and education outside the school grounds," *id.*, at 308, n. 1. We applied the same principle only two Terms ago in *Corporation of Presiding Bishop*, where, citing *Zorach* and *Walz*, we upheld a section of the Civil Rights Act of 1964 exempting religious groups (and only religious groups) from Title VII's antidiscrimination provisions. We found that "it is a permissible legislative purpose to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions." 483 U. S., at 335. We specifically rejected the District Court's conclusion identical to that which a majority of the Court endorses today: that invalidity followed from the fact that the exemption "singles out religious entities for a benefit, rather than benefiting a broad grouping of which religious organizations are only a part." *Id.*, at 333. We stated that the Court "has never indicated that statutes that give special consideration to religious groups are *per se* invalid." *Id.*, at 338. As discussed earlier, it was this same principle of permissible accommodation that we applied in *Walz*.

The novelty of today's holding is obscured by JUSTICE BRENNAN's citation and description of many cases in which "breadth of coverage" *was* relevant to the First Amendment determination. See *ante*, at 10–11. Breadth of coverage is essential to constitutionality whenever a law's benefiting of religious activity is sought to be defended not specifically (or not exclusively) as an intentional and reasonable accommodation of religion, but as merely the incidental consequence of seeking to benefit *all* activity that achieves a particular secular goal. But that is a different rationale—more commonly invoked than accommodation of religion but, as our cases

show, not preclusive of it. Where accommodation of religion is the justification, by definition religion is being singled out. The same confusion of rationales explains the facility with which JUSTICE BRENNAN's opinion can portray the present statute as violating the first prong of the *Lemon* test, which is usually described as requiring a "secular legislative purpose." *Lemon*, 403 U. S., at 612. That is an entirely accurate description of the governing rule when, as in *Lemon* and most other cases, government aid to religious institutions is sought to be justified on the ground that it is not religion *per se* that is the object of assistance, but rather the secular functions that the religious institutions, along with other institutions, provide. But as I noted earlier, the substance of the *Lemon* test (purpose, effect, entanglement) was first roughly set forth in *Walz*—and in *that* context, the "accommodation of religion" context, the purpose was said to be valid so long as it was "neither the advancement nor the inhibition of religion; . . . neither sponsorship nor hostility." 397 U. S., at 672. Of course rather than reformulating the *Lemon* test in "accommodation" cases (the text of *Lemon* is not, after all, a statutory enactment), one might instead simply describe the protection of free exercise concerns, and the maintenance of the necessary neutrality, as "secular purpose and effect," since they are a purpose and effect approved, and indeed to some degree mandated, by the Constitution. However the reconciliation with the *Lemon* terminology is achieved, our cases make plain that it is permissible for a State to act with the purpose and effect of "limiting governmental interference with the exercise of religion." *Corporation of Presiding Bishop*, 483 U. S., at 339.

It is not always easy to determine when accommodation slides over into promotion, and neutrality into favoritism, but the withholding of a tax upon the dissemination of religious materials is not even a close case. The subjects of the exemption before us consist exclusively of "writings promulgating the teaching of the faith" and "writings sacred to a reli-

gious faith." If there is any close question, it is not whether the exemption is permitted, but whether it is constitutionally compelled in order to avoid "interference with the dissemination of religious ideas." *Gillette*, 401 U. S., at 462. In *Murdock* v. *Pennsylvania*, 319 U. S. 105 (1943), we held that it was unconstitutional to apply a municipal license tax on door-to-door solicitation to sellers of religious books and pamphlets. One Term later, in *Follett* v. *McCormick*, 321 U. S. 573 (1944), we held that it was unconstitutional to apply to such persons a municipal license tax on "[a]gents selling books." Those cases are not as readily distinguishable as JUSTICE BRENNAN suggests. I doubt whether it would have made any difference (as he contends) if the municipalities had attempted to achieve the same result of burdening the religious activity through a sales tax rather than a license tax; surely such a distinction trivializes the holdings. And the other basis of distinction he proposes—that the persons taxed in those cases were "religious missionaries whose principal work is preaching"—is simply not available with respect to the first part of the statute at issue here (which happens to be the portion upon which petitioner placed its exclusive reliance). Unlike the Texas exemption for sacred books, which, on its face at least, applies to all sales, the exemption for periodicals applies to material that not only "consist[s] wholly of writings promulgating the teaching of [a religious] faith," but also is "published or distributed by [that] faith." Surely this is material distributed by missionaries. Unless, again, one wishes to trivialize the earlier cases, whether they are full-time or part-time missionaries can hardly make a difference, nor can the fact that they conduct their proselytizing through the mail or from a church or store instead of door-to-door.

I am willing to acknowledge, however, that *Murdock* and *Follett* are narrowly distinguishable. But what follows from that is not the facile conclusion that therefore the State has no "compelling interest in avoiding violations of the Free Ex-

ercise and Establishment Clauses," *ante*, at 17, and thus the exemption is invalid. This analysis is yet another expression of JUSTICE BRENNAN's repudiation of the accommodation principle—which, as described earlier, consists of recognition that "[t]he limits of permissible state accommodation to religion are by no means co-extensive with the noninterference mandated by the Free Exercise Clause." *Walz*, 397 U. S., at 673. By saying that what is not required cannot be allowed, JUSTICE BRENNAN would completely block off the already narrow "channel between the Scylla [of what the Free Exercise Clause demands] and the Charybdis [of what the Establishment Clause forbids] through which any state or federal action must pass in order to survive constitutional scrutiny." *Thomas*, 450 U. S., at 721 (REHNQUIST, J., dissenting). The proper lesson to be drawn from the narrow distinguishing of *Murdock* and *Follett* is quite different: If the exemption comes so close to being a constitutionally required accommodation, there is no doubt that it is at least a permissible one.

Although JUSTICE BRENNAN's opinion places almost its entire reliance upon the "purpose" prong of *Lemon*, it alludes briefly to the second prong as well, finding that § 151.312 has the impermissible "effect of sponsoring certain religious tenets or religious belief in general," *ante*, at 17. Once again, *Walz* stands in stark opposition to this assertion, but it may be useful to explain why. Quite obviously, a sales tax exemption aids religion, since it makes it less costly for religions to disseminate their beliefs. Cf. *Murdock*, *supra*, at 112–113. But that has never been enough to strike down an enactment under the Establishment Clause. "A law is not unconstitutional simply because it *allows* churches to advance religion, which is their very purpose." *Corporation of Presiding Bishop*, *supra*, at 337 (emphasis in original). The Court has consistently rejected "the argument that any program which in some manner aids an institution with a religious affiliation" violates the Establishment Clause. *Muel-*

*ler* v. *Allen*, 463 U. S. 388, 393 (1983) (quoting *Hunt* v. *McNair*, 413 U. S. 734, 742 (1973)). To be sure, we have set our face against the subsidizing of religion—and in other contexts we have suggested that tax exemptions and subsidies are equivalent. *E. g., Bob Jones University* v. *United States*, 461 U. S. 574, 591 (1983); *Regan* v. *Taxation With Representation of Wash.*, 461 U. S. 540, 544 (1983). We have not treated them as equivalent, however, in the Establishment Clause context, and with good reason. "In the case of direct subsidy, the state forcibly diverts the income of both believers and nonbelievers to churches. In the case of an exemption, the state merely refrains from diverting to its own uses income independently generated by the churches through voluntary contributions." Giannella, Religious Liberty, Nonestablishment, and Doctrinal Development, 81 Harv. L. Rev. 513, 553 (1968). In *Walz* we pointed out that the *primary* effect of a tax exemption was not to sponsor religious activity but to "restric[t] the fiscal relationship between church and state" and to "complement and reinforce the desired separation insulating each from the other." 397 U. S., at 676; see also *id.*, at 690–691 (BRENNAN, J., concurring).

Finally, and least persuasively of all, JUSTICE BRENNAN suggests that § 151.312 violates the "excessive government entanglement" aspect of *Lemon*, 403 U. S., at 613. *Ante*, at 20–21. It is plain that the exemption does not foster the sort of "comprehensive, discriminating, and continuing state surveillance" necessary to run afoul of that test. 403 U. S., at 619. A State does not excessively involve itself in religious affairs merely by examining material to determine whether it is religious or secular in nature. *Mueller* v. *Allen, supra*, at 403; *Meek* v. *Pittenger*, 421 U. S. 349, 359–362 (1975) (upholding loans of nonreligious textbooks to religious schools); *Board of Education of Central School Dist. No. 1* v. *Allen*, 392 U. S. 236 (1968) (same). In *Mueller*, for instance, we held that state officials' examination of textbooks to determine whether they were "books and materials used in the

teaching of religious tenets, doctrines or worship" did not constitute excessive entanglement. 463 U. S., at 403. I see no material distinction between that inquiry and the one Texas officials must make in this case. Moreover, here as in *Walz*, see 397 U. S., at 674, it is all but certain that elimination of the exemption will have the effect of *increasing* government's involvement with religion. The Court's invalidation of § 151.312 ensures that Texas churches selling publications that promulgate their religion will now be subject to numerous statutory and regulatory impositions, including audits, Tex. Tax Code Ann. § 151.023 (1982 and Supp. 1988–1989), requirements for the filing of security, § 151.251 *et seq.*, reporting requirements, § 151.401 *et seq.*, writs of attachment without bond, § 151.605, tax liens, § 151.608, and the seizure and sale of property to satisfy tax delinquencies, § 151.610.

## II

Having found that this statute does not violate the Establishment Clause of the First Amendment, I must consider whether it violates the Press Clause, pursuant to our decision two Terms ago in *Arkansas Writers' Project, Inc.* v. *Ragland*, 481 U. S. 221 (1987). Although I dissented in *Ragland*, even accepting it to be correct I cannot conclude as readily as does JUSTICE WHITE, *ante*, at 26, that it applies here.

The tax exemption at issue in *Ragland*, which we held to be unconstitutional because content based, applied to trade publications and sports magazines along with religious periodicals and sacred writings, and hence could not be justified as an accommodation of religion. If the purpose of accommodating religion can support action that might otherwise violate the Establishment Clause, I see no reason why it does not also support action that might otherwise violate the Press Clause or the Speech Clause. To hold otherwise would be to narrow the accommodation principle enormously, leaving it applicable to only nonexpressive religious worship. I do not

think that is the law.  Just as the Constitution sometimes *requires* accommodation of religious expression despite not only the Establishment Clause but also the Speech and Press Clauses, so also it sometimes *permits* accommodation despite all those Clauses.  Such accommodation is unavoidably content based—because the Freedom of Religion Clause is content based.

It is absurd to think that a State which chooses to prohibit booksellers from making stories about seduction available to children of tender years cannot make an exception for stories contained in sacred writings (*e. g.*, the story of Susanna and the Two Elders, Daniel 13:1–65).  And it is beyond imagination that the sort of tax exemption permitted (indeed, required) by *Murdock* and *Follett* would have to be withdrawn if door-to-door salesmen of commercial magazines demanded equal treatment with Seventh-day Adventists on Press Clause grounds.  And it is impossible to believe that the State is constitutionally prohibited from taxing Texas Monthly magazine more heavily than the Holy Bible.

\*      \*      \*

Today's decision introduces a new strain of irrationality in our Religion Clause jurisprudence.  I have no idea how to reconcile it with *Zorach* (which seems a much harder case of accommodation), with *Walz* (which seems precisely in point), and with *Corporation of Presiding Bishop* (on which the ink is hardly dry).  It is not right—it is not constitutionally healthy—that this Court should feel authorized to refashion anew our civil society's relationship with religion, adopting a theory of church and state that is contradicted by current practice, tradition, and even our own case law.  I dissent.