Morris v. MetLife                     CV-03-265-PB  05/25/05

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

**Kim Morris**

**v.**

Case No.  03-cv-265-PB
Opinion No. 2005 DNH 086

**Metropolitan Life
Insurance Company**

MEMORANDUM AND ORDER

Kim Morris is a participant in AT&T Corporation's Long-Term
Disability Plan for Management Employees ("Plan").  She has sued
the Plan's administrator, Metropolitan Life Insurance Company
("MetLife"), arguing that MetLife arbitrarily denied her claim
for long-term disability ("LTD") benefits in violation of the
Employee Retirement Income Security Act of 1974 ("ERISA") as
amended, 29 U.S.C. § 1132(a)(1)(B).  MetLife has moved for
summary judgment.

I.  BACKGROUND[1]

Morris worked as a customer service representative for AT&T
for just over one year.  Admin. R. 142, 205.  Prior to that,

---

[1] The background facts set forth herein are taken from the
Administrative Record ("Admin. R.") filed by MetLife as an
Appendix in support of its motion for summary judgment.  Where
appropriate, additional facts are taken from the pleadings.

Morris, a high school graduate, held jobs as a cashier, a telemarketer, and a secretary. Admin. R. 142. On July 2, 2001, Morris stopped working because she experienced swelling in her hands, urinary frequency, nausea, and tenderness in her neck and lower extremities. Admin. R. 133, 581, 591. Morris received short-term disability benefits ("STD") from July 8, 2001 through July 7, 2002. Def.'s Mot. for Summ. J. at 2; Pl.'s Opp'n. to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n.") at 1.

## A.   **The Plan**

The Plan provides that a participant must be "totally disabled" to receive LTD benefits. During the first year in which a participant is eligible for LTD benefits, a participant is deemed to be "totally disabled" if she is "unable to perform all of the duties of [her] job because of illness or injury . . . ." Admin. R. 241.

The Plan gives MetLife "sole and complete discretionary authority to determine conclusively . . . any and all questions arising from: [a]dministration of the [LTD] Plan and interpretation of all [LTD] provisions[,] [d]etermination of all questions relating to participation of eligible employees and eligibility for benefits." Admin. R. 249. MetLife pays LTD

benefits to eligible participants and obtains reimbursement from AT&T.  Admin. R. 45-49.

## B.  Morris's Medical History

Morris has been diagnosed with Crohn's disease,[2] gastroesophageal reflux disease ("GERD"),[3] and fibromyalgia.[4] Admin. R. 143, 170-72.  Since leaving AT&T, Morris's medical history also includes various surgeries and infections.[5]

---

[2]  Crohn's disease causes inflammation in the small intestine.  See National Digestive Diseases Information Clearinghouse, *Crohn's Disease*, at http://digestive.niddk.nih.gov/ddiseases/pubs/crohns/ (last visited April 2005).

[3] GERD is caused by the abnormal backflow, or reflux, of stomach acids and juices into the esophagus.  See WedMDHealth, *GERD*, at http://my.webmd.com/hw/heartburn/hw99179.asp (last visited May 2005).

[4] Fibromyalgia is a disorder characterized by widespread musculoskeletal pain, fatigue, and multiple tender points.  See National Institutes of Health, *Questions and Answers About Fibromyalgia,* at http://www.niams.nih.gov/hi/topics/fibromyalgia/Fibromyalgia.pdf (last visited April 2005).

[5]  Morris suffered from urinary tract infections in November 2001 and September 2002.  Admin. R. 163, 537, 558.  She also has a history of sinusitis, which is inflammation of the lining membrane of any sinus.  See Stedman's Medical Dictionary ("Stedman's") 1426 (25th ed. 1990).  A surgeon, Dr. Christopher Smith, performed nasal septal deviation on Morris in June 2002. Admin. R. 405-6, 492.

1.  Hand Symptoms

Just prior to leaving her job at AT&T, Morris developed hand pain. Her hands were burning, swelling, and blistered. Admin. R. 595. On June 16, 2001, Dr. Paul Ernsting observed that Morris could barely close her hands and treated her with antibiotics and antihistamines. Morris's primary care physician, Dr. William Hassett, noted that the itching was resolving and that Morris felt "remarkably better" at two check-ups during the following week. Admin. R. 587, 591-93. On July 2, 2001, Dr. Hassett, again noted that her hands had "improved dramatically," and that she had "[f]ull range of motion of the fingers." Admin. R. 581.

On January 19, 2002, Morris again developed blisters on her hands. She applied Silvadene cream and saw Dr. Hassett four days later.[6] The blisters had cleared up and there were areas of pinkish erythema, but no cyanosis or clubbing.[7] Admin. R. 526.

_____

[6] Silvadene cream is a topical cream used to prevent and treat skin infections associated with burns. See www.wedmd.com (last visited May 2005).

[7] Erythema is inflammatory redness of the skin. Stedman's, 533. Cyanosis is a dark bluish or purplish coloration of the skin and mucous membrane due to deficient oxygenation of the blood. Id. at 383. Clubbing is a condition affecting the fingers and toes in which proliferation of distal tissues, especially the nail-beds, results in broadening of the extremities of the digits. Id. at 320.

-4-

In September 2002, Morris saw Dr. Ernsting after developing soreness and vein prominence in her hands. Dr. Ernsting observed that Morris's hands had good radial and ulnar pulses and good perfusion, but also had mild distal clubbing. He further observed that Morris had difficulty closing her hands due to pain. Dr. Ernsting again prescribed Silvadene cream. Admin. R. 163.

2. Fibromyalgia

In July 2001, Morris experienced back pain, neck pain, tenderness in her lower left quadrant, as well as foot and hip discomfort. Admin. R. 568, 572, 581. Given Morris's generalized pain, Dr. Hassett referred her to a rheumatologist, Dr. Shearman. Admin. R. 581. Dr. Shearman conducted a series of tests to determine the nature of her pain and to treat her symptoms. Radiologic exams of Morris's hands and feet revealed no abnormalities. Admin. R. 566-67. Dr. Shearman first diagnosed Morris with systemic vasculitis[8] on August 15, 2001, then suspected inflamation due to a viral infection, and ultimately diagnosed her with fibromyalgia. Admin. R. 548, 552, 561, 154.

---

[8] Vasculitis is inflammation of a blood vessel or of a lymphatic vessel. Stedman's 79, 1690.

-5-

Dr. Shearman prescribed prednisone, an anti-inflammatory, on August 15, 2001, and on September 5, 2001, determined that Morris could not work. Admin. R. 278, 561. However, on October 7, 2001, Dr. Shearman concluded that Morris could return to work on a limited basis and gradually increase her hours. Admin. R. 267. Morris saw Dr. Kovacs on November 20, 2001, for further diagnostic testing and a second opinion. Admin. R. 538-40, 548. Blood tests and antibody levels were normal. Admin. R. 536. Vasculitis of the skin and joints was diagnosed clinically, but not proven by biopsy. Admin. R. 536. After additional tests, on December 21, 2001, Dr. Kovacs diagnosed Morris with fibromyalgia. Admin. R. 529-30.

On January 25, 2002, Morris described "scraping, searing pain" in the back of her right thigh. Admin. R. 521. Dr. Hassett prescribed Vioxx, a pain medication for arthritis. One month later, Morris reported a "reasonable resultant decrease in pain," but still felt joint pain and burning sensations on her skin. Admin. R. 517. In mid-March 2002, she developed pain in her left leg and limped as a result. Admin. R. 515. On April 23, 2002, Morris reported that her fibromyalgia had improved, but that she had shooting pain in her upper and lower extremities.

Admin. R. 485. On September 5, 2002, Dr. Hassett identified multiple trigger points where Morris felt tenderness or pain, and opined that she was disabled from any occupation. Admin. R. 161-62.

### 3. Crohn's Disease

Morris has a history of Crohn's disease for which she has routinely seen Dr. Robert Ruben, a gastroenterologist. Admin. R. 170. In examinations in June and November 2001, Dr. Ruben noted that Morris was doing well in terms of Crohn's disease, with occasional diarrhea but regular bowel movements, and no dysphagia, odynophagia, nausea, or vomiting.[9] Admin. R. 536, 596. However, on March 18, 2002, Morris saw Dr. Ruben with joint pain and frequent bowel movements for which he prescribed Remicade. Admin. R. 508. Two weeks later, on April 4, Morris saw Dr. Doucet for strep throat and he noted that her Crohn's was doing well. Admin. R. 497.

On May 13, 2002, Morris began feeling nauseous and vomited every day or every other day. Dr. Ruben diagnosed her with GERD and prescribed Prilosec. Admin. R. 479, 465-66. Morris lost four pounds in May 2002, and Dr. Ruben noted that the Remicade

---

[9] Dysphagia is difficulty in swallowing. Stedman's, 478. Odynophagia is pain on swallowing. Id. at 1081.

was not helping her bowel problems. At that time, Morris reported feeling mild abdominal discomfort and moving her bowels twice per day. Admin. R. 479. On August 28, 2002, Dr. Ruben noted that while her bowel movements were normal, she continued to feel nauseous and vomited twice a day and had lost a total of twelve pounds. Admin. R. 165.

### 4. Mental Health

On May 21, 2002, Morris mentioned to Dr. Hassett that she was forgetting small things. Admin. R. 452. Her application for LTD, completed on May 8, 2002, also reflected that she was having difficulty concentrating. Admin. R. 143. A medical consultant, Ms. Cheryl Searles, reviewed Morris's files and completed a Mental Residual Functional Capacity assessment ("RFC") for Morris on September 26, 2002. Admin. R. 361-65. Searles determined that Morris was "unable to maintain concentration, persistence, and pace required for substantial gainful activity." Admin. R. 363. Searles based her determination primarily on the comprehensive psychological profile completed by psychologist Dr. Sibylle Carlson, because Morris's record did not contain any other mental health assessment. Admin. R. 363.

On August 27, 2002, Dr. Carlson met with Morris, conducted a mental status examination, and reviewed her records. Admin. R. 389. Carlson stated that Morris had no thought disorder or comprehension problems, and that she had appropriate social functioning. Admin. R. 392-93. However, Dr. Carlson also noted that Morris's memory was unreliable and that she had difficulty concentrating. Admin. R. 393. Dr. Carlson stated that Morris was unable to tolerate work stressors and noted that she became nauseous during their meeting. Admin. R. 393. Her diagnosis was "pain disorder with both a medical condition and psychological factors" and "depressive disorder." Admin. R. 393.

5. Social Security Claim

On August 8, 2002, Dr. Nault reviewed Morris's medical records and completed an RFC for the purpose of evaluating her claim for Social Security disability benefits. Admin. R. 380-88. The RFC noted that none of Morris's treating physicians offered an opinion as to her functional capacity, but Dr. Nault opined that Morris "adequately retains the ability to occasionally lift 10 pounds . . . to be able to stand and ambulate for at least two hours out of an eight-hour workday and to be able to sit for at least six hours out of an eight-hour workday." Admin. R. 386.

## C.  Morris's LTD Claim

Morris applied for LTD benefits on May 8, 2002.  Admin. R. 133.  MetLife denied her claim on July 17, 2002, because it concluded that she was not totally disabled from her own occupation.  Admin. R. 168-69.  This denial was based on a review of Morris's records and an assessment by an independent medical examiner ("IME") Dr. Robert C. Porter, who also reviewed her file.  Admin. R. 169.  Dr. Porter noted that Morris's Crohn's disease was "doing well" as of April 4, 2002, and that her fibromyalgia-related pain did not prevent her from "easily" getting onto a medical examination table.  Admin. R. 170.  Dr. Porter thus recommended that Morris should avoid repetitive work, but that her job responsibilities "should be considered therapeutic in nature."  Admin. R. 171.

Morris appealed MetLife's decision on September 10, 2002, and submitted additional medical records from August and September 2002.  Admin. R. 160-65.  On October 29, 2002, MetLife again denied Morris's application for LTD benefits.  Admin. R. 121.  Just prior to making that decision, MetLife had another independent examiner, Dr. Lieberman, review Morris's records and contact her physicians.  Admin. R. 154-57.  Dr. Lieberman, who

specializes in internal medicine and rheumatology, opined that Morris could return to her job despite her fibromyalgia. Admin. R. 156. Dr. Lieberman noted that Morris's bowels were reported as normal on multiple occasions. Admin. R. 155. However, Dr. Lieberman suggested that MetLife contact Dr. Ruben to determine whether Morris had active Crohn's disease, as she had lost fifteen pounds over a period of four months. Admin. R. 156.

On April 3, 2003, Morris submitted additional medical records including an October 28, 2002 Social Security Administration determination that she was disabled. Pl's Opp'n. at 2, 7. MetLife declined to consider this evidence because it had already issued a final decision denying her appeal.

## II.  STANDARD OF REVIEW

The parties' initial dispute is over the appropriate standard of review. When the denial of benefits is challenged under ERISA, § 1132(a)(1)(B), "the standard of review depends largely upon whether 'the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" Leahy v. Raytheon Co., 315 F.3d 11, 15 (1st Cir. 2002)(quoting Firestone

Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)). If the benefit plan clearly grants the plan administrator discretionary authority, a deferential "arbitrary and capricious" or "abuse of discretion" standard of review is mandated.[10] See id.; see also Terry v. Bayer Corp., 145 F.3d 28, 37 (1st Cir. 1998). This standard means that "the administrator's decision will be upheld if it is reasoned and supported by substantial evidence in the record." Vlass v. Raytheon Employees Disability Tr., 244 F.3d 27, 30 (2001)(internal quotations omitted); see also Cook, 320 F.3d at 19. Substantial evidence means evidence that is "reasonably sufficient to support a conclusion," and the presence of contradictory evidence "does not, in itself, make the administrator's decision arbitrary." Vlass, 244 F.3d at 30. Finally, in reviewing a decision to terminate benefits, "a court is not to substitute its judgment for that of the [decision-maker]." Terry, 145 F.3d at 40 (internal quotations omitted).

Morris concedes, as she must, that the Plan vests MetLife with the discretionary authority to both construe the terms of

---

[10] In the First Circuit, there is no substantive difference between "arbitrary and capricious" and "abuse of discretion" review in the ERISA context. Cook v. Liberty Life Assurance Co. of Boston, 320 F.3d 11, 17 n.7 (1st Cir. 2003).

the Plan and to make benefits determinations.  Nevertheless, she argues that MetLife's judgments are subject to a heightened standard of review because it operated under a conflict of interest.  The alleged conflict on which this argument is based arises from the fact that AT&T, the company that retained MetLife as Plan administrator, is self-insured.  This argument does not require extensive analysis as the First Circuit has determined that such structural arguments do not justify a heightened standard of review.  Wright v. R.R. Donnelly & Sons Co., 402 F.3d 67, 75 (1st Cir. 2005).

Finding no conflict of interest, I must apply an arbitrary and capricious standard of review and proceed to ensure that the termination of LTD benefits was not "objectively unreasonable in light of the available evidence."  Pari-Fasano v. ITT Hartford Life and Accident Ins. Co., 230 F.3d 415, 419 (1st Cir. 2000).

### III.  ANALYSIS

MetLife argues that it is entitled to summary judgment because its decision to deny Morris's claim is supported by substantial evidence.  Morris's principal counter-argument is that MetLife acted arbitrarily because it failed to consider

-13-

additional evidence that she submitted after it had issued a final decision denying her appeal. Morris also argues that MetLife erred in relying on Dr. Lieberman's independent medical evaluation because that evaluation did not cite Dr. Ernsting's medical notes concerning her hand condition and left unanswered other questions concerning the impact of Morris's Crohn's disease on her ability to work.

## A. Post-Appeal Evidence

Morris is mistaken when she argues that MetLife acted arbitrarily when it refused to consider information she provided after its rejection of her appeal became final. The Plan expressly states that "[d]uring its review of *an appeal* of an Adverse Benefit Determination, the Claims Administrator shall: [t]ake into account all comments, documents, records, and other information submitted by the claimant." Admin. R. 249 (emphasis added). The Plan later states, with respect to an appeal, that "decisions by the Claims Administrator and AT&T shall be conclusive and binding on all parties and not subject to further review." Admin. R. 250. Here, MetLife properly followed the Plan, reviewed Morris's appeal and issued a final decision on October 29, 2002. MetLife did not act arbitrarily in refusing to

-14-

reopen its decision to consider evidence submitted after that decision became final.[11]

**B.    Dr. Lieberman's Evaluation**

Morris next argues that MetLife improperly relied on Dr. Lieberman's independent evaluation because he failed to specifically cite Dr. Ernsting's medical notes and failed to properly consider the possibility that Crohn's disease was affecting her ability to work.  I reject both arguments.

Morris complains that Dr. Lieberman failed to specifically cite to Dr. Ernsting's medical notes, but she does not identify any new information in those notes that warranted specific citation.  The notes in question are a very small part of an extensive medical record and the information contained in those notes is cumulative of other evidence that Dr. Lieberman did specifically cite.  Moreover, in denying Morris's appeal, MetLife quoted extensively from one of Dr. Enersting's notes, thus indicating that it was aware of the note when it rejected her appeal.  Dr. Lieberman's failure to specifically cite the note in his evaluation thus is of no consequence.

_____

[11]  Morris has not explained the significance of the post-appeal evidence and I have not attempted to assess the significance of the evidence on my own.

Nor is it significant that Dr. Lieberman raised questions in his evaluation concerning Dr. Rubin's treatment of Morris for Crohn's disease. In addressing these question in its decision rejecting Morris's appeal, MetLife explained that it did not regard the questions as determinative because Dr. Ruben did not indicate either that Morris suffered from active Crohn's disease or that her Crohns's disease imposed any restrictions on her ability to work. Under these circumstances, MetLife did not act arbitrarily in relying on Dr. Lieberman's evaluation.[12]

## IV. CONCLUSION

For the foregoing reasons I grant MetLife's motion for summary judgment (Doc. No. 11). The clerk shall enter judgment accordingly.

SO ORDERED.

_____
Paul Barbadoro
May 24, 2005                              United States District Judge

cc:   Richard Bell, Esq.
      Eugene A. DiMariano, Esq.
      James J. Ciapciak, Esq.

_____

[12] I do not consider the evidence in the record concerning Morris's Mental RFC as Morris has not based her opposition to MetLife's motion for summary judgment on this evidence.

-16-